Opinion
 

 ANDERSON, P. J.
 

 This appeal raises questions concerning the validity of a conditional use permit and negative declaration of environmental impact issued in connection with a religious organization’s application to convert a single-family residence into a neighborhood synagogue with associated uses. The appeal is taken by real party Chabad of North Bay, Inc. (Chabad), from a judgment granting a writ of mandate to command the County of Marin (County) and its Board of Supervisors (Board) to vacate the resolution adopting the use permit and negative declaration. Lucas Valley Homeowners Association, Inc., and several local residents (Homeowners) prosecuted the action below and are appellees herein.
 
 [1]
 

 We must decide whether the Board’s decision to grant the permit and approve the negative declaration was skewed by inaccurate advice about the
 
 *95
 
 scope of its authority to deny a conditional permit for a religious use; whether this decision was supported by substantial evidence in the record as a whole; and whether the conditions of approval, designed to mitigate neighborhood impacts, in fact created an excessive entanglement between church and state. We conclude the inaccurate legal advice was harmless error, the Board’s decision was supported by the evidence, and the conditions of approval pass constitutional muster. Accordingly, we reverse the judgment.
 

 I. Factual Background
 

 Chabad is a small orthodox Jewish congregation with current affiliations consisting of 18 families living in the Lucas Valley community, and another 13 families living elsewhere. In 1988 Chabad contracted to purchase the single-family residence at 1150 Idylberry, San Rafael, and subsequently applied for a conditional use permit to convert the residence into a synagogue with associated religious uses, including adult religious instruction, day care and day school for children, life cycle events, holiday festivals, a ritual bath and administrative services. Previously, congregational activities were conducted in another single-family residence and then on a rotating basis in the homes of individual members. The facility in question is a 4,800-square-foot two-story home located on a 13,500-square-foot lot on a main thoroughfare; it is across the street from a public school and community recreation center.
 

 Chabad members adhere to orthodox practices which require them to dwell near their place of worship. They may not drive on the Sabbath (from sundown Friday to sundown Saturday) or on Jewish holidays. Chabad is the only orthodox synagogue in Marin County (County).
 

 Early on, Homeowners expressed opposition to the proposed conversion, citing concerns about erosion of residential neighborhood qualities, impacts on parking and traffic, and excessive noise. Eventually, 632 Lucas Valley residents signed petitions against the permit.
 

 Meanwhile, the project was the subject of an initial study conducted by County planning staff. During the review process, various program features were eliminated or reduced in order to mitigate identified impacts. This period was also marked by the leadership and involvement of county counsel.
 

 In June 1989 the county planning commission (Commission) unanimously approved the declaration and granted the permit after a noticed public
 
 *96
 
 hearing. Homeowners appealed to the Board. After an extensive hearing, the Board also approved the declaration and granted the permit, but imposed somewhat more stringent conditions. The resolution also included an exception from the local parking standards which required 21 off-street spaces.
 

 The project, as finally approved, included daily and holiday prayer services;
 
 [2]
 
 three holiday festivals (maximum attendance of 50); adult classes (4 days a week, maximum attendance of 5) and lectures (3 times per year, maximum attendance 50); children’s educational programs, Monday through Friday, for 18 children and Hebrew school on Sundays for 10 children; office staffed by 4; ritual bath by appointment (3 men per day, 1 woman per week); 11 life cycle and special events per year, maximum attendance of 50; and 5 “Friday Night Live” services for up to 50 persons.
 

 Homeowners petitioned for a writ of mandate to overturn the Board’s actions. The trial court granted the writ upon arriving at the following findings: (1) The Board failed to proceed in the manner required by law in granting preference to Chabad because it is a religious organization; under California law, Chabad is not entitled to a preference in obtaining a use permit; (2) the material findings supporting the permit are not backed by substantial evidence in the record; (3) the permit conditions constitute excessive entanglement in the religious freedom of Chabad; (4) the Board abused its discretion in granting Chabad an exception to the parking requirements; and (5) the Board failed to proceed in the manner required by law in approving a negative declaration and not requiring an environmental impact report (EIR). The court further found that county counsel’s participation in County’s consideration of Chabad’s application did not deprive Homeowners of a fair hearing before either the Commission or the Board. Homeowners did not appeal this finding.
 

 II. County Zoning Scheme
 

 1150 Idylberry Road, the cite of Chabad, is zoned R-l for single-family residences. The County permits churches in all R-l districts, “subject to the securing of a use permit in each case.” (Marin County Code,
 
 [3]
 
 ch. 22.22, § 22.22.020(6).)
 

 
 *97
 
 In order to grant a use permit, the decisionmaker, be it the zoning administrator, Commission or Board, must make the following findings and determinations: “The establishment, maintenance or conducting of the use for which a use permit is sought will not, under the particular case, be detrimental to the health, safety, morals, conduct, convenience, or welfare of persons residing or working in the neighborhood of such use and will not, under the circumstances of the particular case, be detrimental to the public welfare or injurious to property or improvements in the neighborhood.” (Ch. 22.88, § 22.88.020(4).)
 

 The local code also authorizes conditions to be attached upon issuance of a use permit.
 
 [4]
 
 Additionally, local development standards require that every main building or use be provided with a minimum number of off-street parking spaces. In the case of assembly halls without fixed seats, the minimum is one per one hundred square feet of gross floor area. (Ch. 24.04, § 24.04.340(e).) Where the particular circumstances justify an exception to the parking requirements, the number of spaces can be decreased by design review, subject to specific findings regarding the circumstances and reasons. (Ch. 24.04, § 24.04.330.) The chapter on exceptions and variances sets forth the particulars for granting an exception to any of the development standards. (Ch. 24.15, § 24.15.010.)
 

 III. Standard of Review
 

 This is an administrative mandamus action governed by Code of Civil Procedure section 1094.5 which provides in part that “(b) The inquiry in such a case shall extend to the questions whether . . . there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence, (c) Where it is claimed that the findings are not supported by the evidence, . . . abuse of discretion is established if the court determines . . . that the findings are not supported by substantial evidence in light of the whole record.”
 

 The “in light of the whole record” language means that the court reviewing the agency’s decision cannot just isolate the evidence supporting
 
 *98
 
 the findings and call it a day, thereby disregarding other relevant evidence in the record.
 
 (Bixby
 
 v.
 
 Pierno
 
 (1971) 4 Cal.3d 130, 149 [93 Cal.Rptr. 234, 481 P.2d 242].) Rather, the court must consider all relevant evidence, including evidence detracting from the decision, a task which involves some weighing to fairly estimate the worth of the evidence.
 
 (County of San Diego
 
 v.
 
 Assessment Appeals Bd. No. 2
 
 (1983) 148 Cal.App.3d 548 [195 Cal.Rptr. 895].) In any event, our scope of review on appeal is identical to that of the trial court.
 
 (Bixby, supra, 4
 
 Cal.3d at p. 149.)
 

 The same rules apply to both the granting of the use permit and the declaration of negative impact.
 
 [5]
 
 Because a negative declaration must be premised on the finding that there is no substantial evidence before the agency that the project, as initially submitted or revised, may have a significant effect on the environment (§ 21080, subd. (c)), the adoption of a negative declaration will not be upheld merely because there is substantial evidence that no such impact will occur. Instead, the reviewing court must determine whether substantial evidence supports the conclusion that there is no fair argument to be made that the project might have a significant environmental impact.
 
 (Friends of “B” Street
 
 v.
 
 City of Hayward
 
 (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514];
 
 Heninger
 
 v.
 
 Board of Supervisors
 
 (1986) 186 Cal.App.3d 601, 605-608 [231 Cal.Rptr. 11].)
 

 Finally, we keep in mind that substantial evidence has been defined as “ponderable legal significance . . . reasonable in nature, credible, and of solid value.”
 
 (County of San Diego
 
 v.
 
 Assessment Appeals Bd. No. 2, supra, 148
 
 Cal.App.3d at p. 555, internal quotation marks omitted, quoting
 
 Ofsevit
 
 v.
 
 Trustees of Cal. State University & Colleges
 
 (1978) 21 Cal.3d 763, 773, fn. 90 [148 Cal.Rptr. 1, 582 P.2d 88].)
 

 IV. County Counsel’s Advice: The Preference Issue
 

 Chabad and County attack the trial court’s ruling that the Board’s use permit approval was tantamount to granting Chabad an unconstitutional preference. This preferential treatment, the court reasoned, stemmed from
 
 *99
 
 county counsel’s erroneous advice that churches are legally preferred uses, and the burden of proof in the use permit decisionmaking process shifts from applicant to the County to show clear and convincing evidence of detrimental impact to the community and a parking shortage.
 

 Chabad approaches the Board’s action as one of permissible accommodation of religion; County similarly argues that the religious nature of the use cannot be entirely ignored and at some point religious freedom becomes a factor in land use decisions in this state. Homeowners counter that under California law, churches applying for a use permit must in all instances be treated exactly like secular applicants; they assert in this case the Board impermissibly bent the rules. We first review the relevant constitutional principles, then summarize the gist of county counsel’s advice and finally analyze any “error” therefrom for its prejudicial effect.
 

 A.
 
 The Religion Clauses
 

 Our federal and state Constitutions guarantee the freedom to practice one’s own form of religion and forbid governmental involvement in the establishment of religion. Often, as in this case, there is tension at the fringes of both concepts as a religious organization, attempting to establish a place of worship, encounters the strictures of an existing regulatory scheme.
 

 Free exercise challenges to zoning ordinances which exclude churches from residential zones have been unsuccessful in California. Years ago a reviewing court rejected a church’s contention that application of such an ordinance was an unwarranted restriction of religious worship.
 
 (Corp. Presiding Bishop
 
 v.
 
 City of Porterville
 
 (1949) 90 Cal.App.2d 656, 660 [203 P.2d 823].) The court reasoned that denial of the permit did not prevent anyone from worshipping according to his or her faith, and that nothing in the record indicated the building could not be erected in another, appropriate zone.
 
 (Ibid.)
 

 Moreover, in California a church is to be treated just like any nonsectarian enterprise when determining the extent of its compliance with zoning legislation. As stated in
 
 Minney
 
 v.
 
 City of Azusa
 
 (1958) 164 Cal.App.2d 12, 20-21, 24 [330 P.2d 255], “a church, like any other property owner, is to be considered on its merits as fitting into the general scheme of a comprehensive zoning, entitled to no preference and subject to no adverse discrimination.”
 
 (Id.
 
 at p. 24.)
 

 In addition, it is without question that a public entity can, consistent with respecting free exercise rights, require that a church obtain a use permit prior
 
 *100
 
 to locating in a residential zone.
 
 (Matthews
 
 v.
 
 Board of Supervisors
 
 (1962) 203 Cal.App.2d 800 [21 Cal.Rptr. 914].) Likewise, the decision to issue such a permit will be upheld where there are adequate findings supported by substantial evidence in the record.
 
 (Stoddard
 
 v.
 
 Edelman
 
 (1970) 4 Cal.App.3d 544 [84 Cal.Rptr. 443].)
 

 The United States Supreme Court has yet to deliver a free exercise decision where a zoning law is squarely at issue.
 
 [6]
 
 A number of lower courts have faced this issue, most recently the Ninth Circuit in
 
 Christian Gospel Church
 
 v.
 
 San Francisco
 
 (9th Cir. 1990) 896 F.2d 1221. There, a church of 50 members was denied a conditional permit to establish its religious institution in a single-family residence in an R-l zone. The appellate court evaluated the zoning challenge by examining three factors: (1) The magnitude of the statute’s impact upon the exercise of religious belief; (2) whether there was a compelling state interest justifying the burden imposed; and (3) the extent to which the recognition of an exemption would impede the state’s objectives.
 
 [7]
 

 (Id.
 
 at pp. 1223-1224.) The court concluded the burden on religion was minimal—being one of convenience and expense which merely required locating another forum for worship—and thus the church did not merit an exemption from the zoning scheme. On the other hand, it viewed San Francisco’s interests in maintaining the integrity of its zoning scheme and protecting the residential quality of its neighborhoods as strong, pointing out that the use of the dwelling for worship “would bring
 
 *101
 
 traffic and noise problems to an otherwise quiet residential neighborhood.”
 
 (Id.
 
 at pp. 1224-1225.)
 

 To withstand scrutiny under the federal establishment clause, the test is somewhat different. The government will be held to trod on this clause only if its actions are motivated by religious intent, or result in primarily religious effects, or create excessive church-state entanglement.
 
 (Lemon
 
 v.
 
 Kurtzman
 
 (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105].) Federal precedent also teaches “ ‘that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.’ [Citation.] It is well established, too, that ‘[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.’ [Citation.] There is ample room under the Establishment Clause for ‘benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.’ ”
 
 (Corporation of Presiding Bishop
 
 v.
 
 Amos
 
 (1987) 483 U.S. 327, 334 [97 L.Ed.2d 273, 282, 107 S.Ct. 2862], holding that a statutory exemption allowing religious employers to discriminate on religious grounds in hiring for nonreligious jobs does not run afoul of establishment clause.) Government’s efforts to accommodate religion will be tolerated when they remove burdens on the free exercise of religion.
 
 (County of Allegheny
 
 v.
 
 A.C.L.U.
 
 (1989) 492 U.S. 573, 601, fn. 51 [106 L.Ed.2d 472, 499-500, 109 S.Ct. 3086], citing
 
 Corporation of Presiding Bishop
 
 v. Amos, supra, at p. 348 [97 L.Ed.2d at pp. 290-291], O’Connor J., conc. in judgment.)
 

 The California Constitution, while mandating separation of religion and state in language virtually identical to the federal clause, additionally proclaims without federal parallel: “Free exercise and enjoyment of religion
 
 without discrimination or preference
 
 are guaranteed.” (Cal. Const., art. I, § 4, italics added.) Thus, in our state, preference is forbidden even when there is no discrimination, leading California courts to suggest that this clause is more protective of the separation principle than the federal guarantee.
 
 (Fox
 
 v.
 
 City of Los Angeles
 
 (1978) 22 Cal.3d 792, 796 [150 Cal.Rptr. 867, 587 P.2d 663];
 
 Sands
 
 v.
 
 Morongo Unified School Dist.
 
 (1991) 53 Cal.3d 863 [281 Cal.Rptr. 34, 809 P.2d 809].) Justice Mosk, concurring in
 
 Sands
 
 states the preference prohibition this way: “[T]he preference clause seeks to prevent government from giving
 
 any
 
 advantage to religion in California. The relevant inquiry is whether government has granted a benefit to a religion or religion in general that is not granted to society at large. Once government bestows that differential benefit on religion, it has acted unconstitutionally in this state.”
 
 (Id.
 
 at pp. 911-912, italics in original.) By the same token, the law cannot discriminate against religious institutions; this means, in the context
 
 *102
 
 of the County zoning scheme, that they are entitled to be considered on the same basis as other community-enhancing uses and facilities when it comes to land use decisions.
 

 Further evidence of the principle of governmental neutrality in religious matters is found in article XVI, section 5 of the California Constitution which states: “Neither the Legislature, nor any county . . . , shall ever make an appropriation, or pay from any public fund whatever,
 
 or grant anything to or in aid of a religious sect, church, creed or sectarian purpose
 
 . . . .” (Italics added.) This provision bans not only monetary aid to religion, but any official involvement that promotes religion.
 
 (California Educational Facilities Authority
 
 v.
 
 Priest
 
 (1974) 12 Cal.3d 593, 605, fn. 12 [116 Cal.Rptr. 361, 526 P.2d 513];
 
 Sands, supra,
 
 53 Cal.3d at p. 883.) However, the rule is flexible enough to admit the passage to religious institutions of indirect, remote, and incidental state benefits which have a primary public purpose.
 
 (California Educational Facilities Authority
 
 v.
 
 Priest, supra,
 
 12 Cal.3d at p. 605.)
 

 B.
 
 County Counsel’s Advice
 

 Against this backdrop, we turn now to the substance of county counsel’s advice. To begin with, he repeatedly advised the county planning department (Department) that parking standards must take into account the existence of on-street parking “absent clear and convincing evidence of a parking shortage in the area.” This meant, he explained, that the burden of proof on this issue shifted from the applicant to the agency. He also advised the Department Director that a church is a preferred use because it is protected by the First Amendment and, thus, any permit conditions that severely restrict or prohibit the proposed use are deemed suspect. Given the availability of street parking and Chabad’s equal right to use those spaces, in his opinion County could not prohibit the proposed use due to lack of on-site parking, nor require an EIR to study the parting issue. And in a letter to the Board prior to its hearing on Homeowners’ appeal, he counseled that denial of the permit for a church “must be premised on clear and convincing evidence of detrimental impact to the community.” Finally, the study report submitted to the commissioners and supervisors indicated that in reviewing, with county counsel, the possible impacts of substituting street for on-site parting, “staff has been apprised of certain aspects of constitutional law limiting the scope of the local jurisdiction’s authority in regulating ‘church’ uses.”
 

 Without question, the County zoning scheme, outlined above, is an acceptable accommodation of religious
 
 and other
 
 highly valued assembly uses.
 
 *103
 
 County counsel correctly argued as much to the decisionmakers in various letters and meetings when he referred to churches as “preferred uses.” However, the clear and convincing standard of proof which he advanced throughout the approval process does not square with the authority reviewed above. Heightened justification for government action—namely, the compelling state interest hurdle—is called for only when the government directly or indirectly coerces one’s religious beliefs or behavior. This is not the case here, even though Chabad members would be burdened in the practice of their religion were they not allowed to go forward with the synagogue at 1150 Idylberry Road. They have no right to fend off the effects of noncoercive, neutral government action which simply makes it more onerous to practice their religion. (See
 
 Lyng
 
 v.
 
 N.W. Indian Cemetery Prot. Asso., supra,
 
 485 U.S. at p. 450 [99 L.Ed.2d at p. 547].)
 

 Homeowners see county counsel’s advice as leading the decisionmakers to treat Chabad as a preferred customer, the use permit with parking exception being the ultimate unconstitutional preference. Chabad sees the permit as a permissible accommodation under the federal principles outlined above.
 
 [8]
 
 Both positions jump the gun because county counsel’s advice, standing alone, is not the issue—its
 
 impact
 
 on the Board’s decision is. Error occurring in an administrative proceeding will not vitiate the ruling unless it actually prejudices the petitioner.
 
 (Steele
 
 v. L.A.
 
 County Civil Service Com.
 
 (1958) 166 Cal.App.2d 129, 137 [333 P.2d 171] [to the same effect, Gov. Code, § 65010, subd. (b) requires prejudice, defined as substantial injury to petitioner plus probability of a different result, for procedural errors in zoning and planning matters].) The question this appeal frames is whether county counsel’s advice on the burden of proof skewed the result—is it more probable than not that the permit would have been denied absent his comments?
 

 The vote was three to two. At the beginning of the Board hearing, county counsel reiterated that the level of proof was higher than ordinary permit situations. Nevertheless, from the ensuing colloquy between counsel and the supervisors, it is clear the supervisors knew they could deny the permit. One quoted counsel’s letter pertaining to the burden of proof; this same supervisor indicated his understanding that the Board was there to protect the religious nature of the application, but also to protect the community. He voted against the permit. Another supervisor who asked for clarification
 
 *104
 
 about the balancing test voted against the permit. One of the three who approved the permit expressed concern that certain
 
 conditions
 
 would inhibit Chabad members’ free exercise of religion. Another “yes” voter, also in the context of urging against draconian conditions, articulated his understanding that the Board was “under some constitutional mandates to do something,” yet had also to be cognizant of disruptions to the neighborhood.
 

 The Board also had the benefit of opposing views and was aware of the diversity of legal opinion. Advocates for Homeowners furnished the Board with several legal memoranda and written critiques; these same advocates aired their opinions, and criticism of county counsel’s views and actions, at the hearing.
 

 From our review of the entire record, we cannot say it is more probable than not that the supervisors who approved the permit did so under compulsion of county counsel’s legal advice. However, assuming for purposes of argument that all the supervisors heeded this advice, we still must ask whether it is more likely than not that the Board would have denied the permit had it adhered to “normal” procedures where the burden of proof is on the applicant to show the proposed use will not be detrimental to the community. We think not. This is because, based on our evidentiary review in parts V-VI below, we find there was overwhelming evidence that the project,
 
 as approved,
 
 would not be a detriment to the community or have a significant environmental impact on Lucas Valley.
 

 V. Findings Regarding Use Permit
 

 Chabad and County challenge the trial court’s conclusion that there was no substantial evidence in the record to sustain any of the material findings which the Board made when approving the use permit. The Board found that the proposed use “will not, under the particular case, be detrimental to the health safety, morals, comfort, convenience, or welfare of persons residing or working in the neighborhood . . . and will not, under the circumstances of the particular case, be detrimental to the public welfare or injurious to property or improvements in the neighborhood.”
 
 [9]
 
 Backing this finding were seven specific reasons why Chabad’s plan would not be harmful to the community. These reasons include: (1) The proposed use is a neighborhood-serving religious institution; (2) no significant parking problems will occur; (3) potential noise impacts will be reduced by conditions of approval prohibiting amplified music or live bands outdoors; and (4) conditions of
 
 *105
 
 approval limiting the frequency of outdoor events and number of attendees at proposed events will reduce potential neighborhood impacts to a reasonable and insignificant level.
 

 On appeal the parties have focussed on the trial court’s conclusions concerning the scope of Chabad’s use and the evidence pro and con concerning impacts on parking, traffic, property values and noise levels. Permeating the court’s discussion of these factors is its belief that the various conditions designed to reduce detrimental impacts are unworkable under the “excessive entanglement” doctrine. We first analyze the excessive entanglement issue and then proceed to evaluate the evidentiary basis for each area of concern.
 

 A.
 
 The “Excessive Entanglement” Analysis
 

 The trial court determined that the conditions the Board approved inevitably will require comprehensive and discriminating surveillance and an evaluation of religious content. The “offensive” permit conditions pertain to maintaining a weekly attendance log; permitting only six children outdoors at any one time; requiring that ceremonial or celebratory functions be conducted for the benefit of sustaining members; restrictions on outdoor activities and outdoor music; and requiring that only events with “specific religious content” be permitted to occur on site. The trial court then held that these conditions would constitute an excessive entanglement in the religious affairs of Chabad, citing
 
 Lemon
 
 v.
 
 Kurtzman, supra,
 
 403 U.S. 602.
 

 In
 
 Lemon,
 
 the high court struck down two state statutes calling for state aid to nonpublic schools for providing instruction in secular subjects. The statutes were found to foster an “excessive and enduring entanglement between state and church” because of the “comprehensive, discriminating and continuing state surveillance” necessary to ensure that parochial teachers did not inject religious values and content into the state assisted secular courses and that the state funds did not spill over into the religious education program.
 
 (Lemon, supra,
 
 403 U.S. at pp. 619-620 [29 L.Ed.2d at pp. 759-760].) The level and type of governmental supervision constituted an impermissible entanglement precisely because it involved discerning between secular and sectarian subjects, values and beliefs. Thus the state, to some extent, would be involved in the business of evaluating the religious content of the organization.
 

 Lemon,
 
 however, does not decry all church-state contacts and involvement. In our complex society, characterized by an inescapable, extensive network of governmental regulations, it is impossible to wall off state from
 
 *106
 
 church and stamp out any sign of relationship between the two. The court in
 
 Lemon
 
 recognized that “[s]ome relationship between government and religious organizations is inevitable. [Citation.] Fire inspections,
 
 building and zoning regulations
 
 ... are examples of necessary and permissible contacts.”
 
 (Lemon, supra,
 
 403 U.S at p. 614 [29 L.Ed.2d at pp. 756-767], italics added.)
 

 In the recent case of
 
 Swaggart
 
 v.
 
 Calif. Equalization Bd., supra,
 
 493 U.S. 378 [107 L.Ed.2d at p. 796], the Swaggart Ministries attacked this state’s application of sales and use tax to its sale of religious materials. The high court found no impermissible entanglement for three reasons: “First, we note that the evidence of administrative entanglement in this case is thin. ...[¶] Second, even assuming that the tax imposes substantial administrative burdens on appellant, such administrative and recordkeeping burdens do not rise to a constitutionally significant level. . . . [W]e have held that generally applicable administrative and recordkeeping regulations may be imposed on religious organization without running afoul of the Establishment Clause. ... [¶] Most significantly, the imposition of the sales and use tax without an exemption for appellant does not require the State to inquire into the religious content of the items sold or the religious motivation for selling or purchasing the items . . . .”
 
 (Id.
 
 at pp. 394-396 [107 L.Ed.2d at pp. 812-813].)
 

 As we explain, the permit conditions do not amount to an excessive entanglement under
 
 Lemon.
 
 First, the trial court inaccurately viewed the attendance log as requiring
 
 County
 
 to determine the location of members’ residences. In fact, the resolution merely required that Chabad was to maintain a weekly log on the number of attendees and, to the extent possible, their point of origin. The resolution does not call for an exact address; presumably, a generalized reference, e.g., Lucas Valley, Sonoma County, would be in order. The log is also a tool for monitoring facility use to ensure that the maximum number of persons permitted per function is not exceeded. While the log itself is a weekly affair, County does not become involved in any formal review for six months. Informal spot checks would be in keeping with the resolution, and in our view these checks and reviews do not amount to excessive administrative entanglement.
 

 Second, the trial court also mistakenly assumed that the limit on children outdoors would require determining who the six “rotating children” are, when, in fact, the condition just means that children would be let outside in groups of six rather than en masse. Certainly the idea of shifts is common to many school and childcare operations. Further, nothing in this condition
 
 *107
 
 requires County to do anything. These requirements amount to nothing more than the familiar signs “Maximum Capacity of this Room: 50 persons.”
 

 Nor was there any specific monitoring condition attached to the restriction that “ceremonial or celebratory” functions be conducted “for the benefit of, or on behalf of, sustaining members of the congregation or their families.”
 
 [10]
 
 County does not have to decide who is a sustaining member. It is left to Chabad’s good faith to ensure that ceremonial and celebratory functions are sponsored solely for sustaining members; to show compliance, Chabad could again record the information in log-type, numerical fashion, without reference to names. The trial court worries that County would also become immersed in discerning which events were ceremonial or celebratory. We fail to see the problem; the only events that possibly could be conducted “for the benefit of, or on behalf of,” a person are the life cycle events—namely, two ritual circumcisions, four weddings and four bar mitzvahs.
 

 Fourth, the resolution did not include any third party monitoring for ensuring that noise mitigation conditions would be met. Rather, it specifically called for
 
 self-monitoring
 
 to ensure a noise level consistent with a residential neighborhood. This is a reasonable “condition,” something that members of many neighborhood communities undertake gratuitously.
 

 The above conditions are concerned with mundane matters such as numbers, hours, location and noise restrictions. None entangle County or the community in divining religious content or otherwise passing on the religious affairs of Chabad. Nor does the modest monitoring program inject the County in “excessive and enduring” involvement with Chabad. If, upon periodic review, Chabad fails to comply substantially with the conditions, the permit could be cancelled, ending all church-state entanglement. If compliance proves substantial, periodic monitoring should be fairly innocuous.
 

 Finally, a careful reading of the resolution also reveals that although “only events or functions with specific religious content” are permitted on site, this condition does not create a corresponding impermissible entanglement between County and Chabad. The resolution also approves of all activities, functions and events listed in an attached “Exhibit A.” This exhibit delineates in minute detail the prayer services, religious holiday services and festivals, and educational and special events which Chabad proposed to conduct. In the very paragraph mandating a religious content element to
 
 *108
 
 every function, the Board also approved all functions, events and activities listed on “Exhibit A.” By virtue of being approved (i.e., permitted), these functions pass the “specific religious content” test and, therefore, County will not be called upon to define religious content.
 

 Note, too, that it was Chabad which originally provided County with this list of proposed activities and functions. The resolution simply prohibits parties, receptions and other nonreligious, nonapproved uses. Should it come to County’s attention, for example, that Chabad was hosting a bingo night or some other secular form of entertainment, County’s limited intrusion into Chabad’s affairs to verify whether the facility was being used for the intended purposes would not offend
 
 Lemon
 
 or the establishment clause. It boils down to Chabad’s good faith. As Chabad and County point out, how could religious organizations ever secure a conditional use permit to locate in a residential zone if they are not allowed to demonstrate their ability and willingness to mitigate potential neighborhood impacts by adhering to reasonable, mitigating conditions? Chabad has agreed to restrict its use to the scope and content of “Exhibit A,” and should not be thwarted, under a misguided entanglement analysis, from demonstrating its good faith.
 

 B.
 
 Evidentiary Review
 

 (1)
 
 Neighborhood-serving use
 

 The Board specifically found that the proposed use is a neighborhood-serving religious institution in that a majority of Chabad members are from the local community. This finding, of course, distinguishes Chabad from an institution evolving toward a primarily regional constituency. The trial court determined there was no substantial evidence that the permit would or could be confined to a neighborhood-serving use without the County’s becoming excessively entangled in Chabad’s internal affairs.
 

 The evidence overwhelmingly supports the Board’s finding. The primary users of the facility are 18 families residing in the immediate Lucas Valley vicinity within walking distance of Chabad. Chabad anticipated that this nucleus would provide a majority of attendees at all functions. Monitoring would include a weekly log which noted, as feasible, the point of origin (i.e., Lucas Valley/non-Lucas Valley) of those in attendance. Substantial noncompliance with any condition could result in County revoking the permit.
 

 Apart from its excessive entanglement concern (discussed above), the trial court’s real concern seems to be that despite what it said, Chabad intended to
 
 *109
 
 expand regionally. This fear is not a reason to ignore the substantial evidence in the record. Moreover, a central tenet of Chabad’s orthodoxy is that members do not drive on the Sabbath or holidays. It follows that for the most part those drawn to Chabad would be adherents living within walking distance of the facility.
 

 (2)
 
 Parking
 

 Second, the trial court found there was no substantial evidence that significant parking problems would not occur. The maximum number of off-street parking spaces required would be 21, based on the square footage of the building. The resolution contains detailed findings about parking, namely, at least 64 on-street spaces exist in the immediate vicinity; these spaces are not located in front of adjacent homes; demand for these will be minimized because at least a majority of attendees at regular services shall be immediate Lucas Valley residents, expected to walk; special functions shall be conducted for the benefit of sustaining members; approval conditions require Chabad to ensure that participants do not park directly in front of single-family homes; maximum attendance at special programs is limited to 50, and oftentimes a lesser number.
 

 It is beyond dispute that the 64 parking spaces are available on a first-come, first-served basis in the area adjacent to Chabad. Homeowners point to testimony and portions of the various planning reports that refer to a potential parking crunch because of competition for these spaces. For example, the first draft planning report, dated July 18, 1988, indicated that intense competition was “said to exist at certain times” for these spaces from residents and guests, as well as regular users of the school facilities. This report, based on the project scope as originally submitted, also recommended an expanded parking study to assess potential impacts on the neighborhood should these spaces be considered in lieu of the required off-street spaces. Later versions reiterated the perception that street parking is usually taken during major activities at the Dixie School site.
 

 It is also beyond dispute that the project as approved anticipates a small number of people attending regularly scheduled programs. Moreover, the conditions require that a majority of attendees at these functions be drawn from the immediate area, and it was expected that most would probably walk. Additionally, Chabad is held responsible under the permit for encouraging carpooling of children to and from the facility.
 

 
 *110
 
 While there is a greater possibility of parking congestion surrounding the special events (29 per year),
 
 [11]
 
 we are mindful that attendees at these events are limited to 50 persons and in several instances 25 or less. Further, the conditions hold Chabad responsible for ensuring that participants, to the extent possible, do not park directly in front of homes. As the County points out, it would be impossible for
 
 any
 
 church or community organization to locate in an R-l zone without
 
 some
 
 potential parking impacts. However, the standard is “detrimental to the comfort, convenience or welfare of persons residing ... in the neighborhood.” “Detrimental” means “obviously harmful: damaging.” (Webster’s New Collegiate Diet. (9th ed. 1984) p. 346.) From our review of the entire record we conclude there is substantial evidence that parking problems potentially generated by the proposed use would be ameliorated to a minimal, nondetrimental level due to Chabad’s neighborhood focus, the doctrinal prohibition against driving on religious holidays, and the various mitigation measures discussed above.
 

 (3)
 
 Traffic
 

 The trial court found there was no substantial evidence that the proposed use would not detrimentally affect the neighborhood because of traffic. Its rationale is less than convincing. The court cited the testimony of Farhad Mansourian, county’s traffic operations engineer. Mr. Mansourian explained that after Chabad had successively reduced its numbers to the point that the proposed use would generate only three to six times the number of trips per year of a single family, county counsel advised him that a full-fledged traffic study would not be warranted.
 
 [12]
 
 Prior to these reductions, Mansourian had recommended an expanded traffic study.
 
 [13]
 

 This testimony is a non sequitur with respect to the court’s substantial evidence finding, and relates only part of the story. Ron Glas, senior planner
 
 *111
 
 for County, clarified that the project as submitted to the Board would generate 11,425 trips per year, 3 times that of a single family, which generates 3,600 trips annually, assuming a car occupancy of 2.5 persons per car. This estimate takes no account of any walking or additional car pooling (beyond the 2.5 persons per car), does not reflect the further attendance reductions which the Board made after the hearing, and assumes full attendance at all daily and special events.
 

 We observe, too, that the original draft study, which estimated attendance at children’s classes as “up to 74," identified safety concerns for motorists and pedestrians arising from dropping off and picking up the students. The report recommended that Chabad encourage carpooling for school functions and that Chabad itself be encouraged or required to provide a school shuttle service. With the final number of children attending daily classes reduced to 18, the revised study indicated that drop off/pick up of children was not deemed environmentally problematic, and noted that conditions of approval included encouraging carpooling for school and encouraging Chabad to institute a minibus/shuttle service for school functions.
 

 Against this evidence Homeowners emphasize the testimony of several residents relating fears for the safety of children and others in light of an anticipated increase in traffic. Declarations were also submitted attesting to a “large increase in traffic” on Idylberry Road, the observance of Chabad members making U-turns on a regular basis, and the growing number of visitors to Chabad.
 

 While unquestionably the proposed use would generate some traffic impact, the test is whether these impacts are potentially detrimental or significant. At the final level and intensity of use actually approved by the Board, there indeed was substantial evidence in the whole record demonstrating the absence of detrimental traffic impacts.
 

 (4)
 
 Noise
 

 The court likewise found there was no substantial evidence that detrimental noise impacts would not occur without excessive entanglements. The initial study points out that although the project may produce more noise than expected from a typical single-family use, “it is doubtful that any noise generated by the project would cause the general noise environment to exceed” the County sound level maximum of 55 dB(A). Witnesses at the Board hearing testified to various aspects of the perceived noise impacts: lack of buffers; vulnerability of the glass “Eichler” homes to noise penetration; the
 
 *112
 
 extent of singing and chanting during Chabad celebrations; noise associated with increased vehicular traffic (door slamming, ignitions starting, horn honking, etc.). The draft study reports concluded that noise generated by outdoor use could raise the noise annoyance level of immediate neighbors “to an unacceptable degree” and proposed five measures designed to minimize the potential for neighborhood annoyance from noise. All were adopted by the Board; we have already concluded they are valid.
 

 They include: Limiting the frequency (once every two months) and number (not more than six per year) of outdoor or quasi-outdoor functions; prohibiting amplified musical instruments or live bands outdoors; limiting the hours during which any outdoor activity can occur (none prior to 10 a.m. or after 8:30 p.m., except Friday activities can extend to 9 p.m.); permitting only six children outside at any one time during children-specific activities; and six-month, and then annual project review for the first three years thereafter.
 

 There is sustantial evidence in the record that potential noise impacts were mitigated to a reasonable and insignificant level in view of the project as scaled down and finally approved. This is not to say that some people, some of the time, would not be irritated or disturbed. The test, however, is whether the noise impacts render the proposed use detrimental—that is, “obviously harmful”—to the community. We think not. In our view the modicum of potential discomfort forthcoming from these curtailed outdoor activities cannot reasonably be considered “detrimental” within the meaning of the zoning ordinance.
 

 (5)
 
 Property values
 

 Finally, the trial court found there was no substantial evidence that property values would not decrease due to Chabad’s presence. Indeed, it characterized the evidence that property values would decline as “overwhelming.” There was no such evidence.
 

 Aside from general allusions to property values by several witnesses, the only specific references to possible depreciation appear in the declaration of Samuel Wester and a letter from Nancie Bottmeyer.
 

 Wester, a local real estate agent, stated that in his experience, a house in close proximity to Chabad would “suffer a substantial economic impact by reason of the granting of this permit. . . . While the exact impact . . . cannot be estimated with any precision, I would counsel a prospective buyer
 
 *113
 
 ... [to bid] 10% less than would otherwise be the case.” Wester’s statement at best is a speculative, imprecise opinion, without any supporting, verifiable data such as comparables.
 

 Bottmeyer in turn wrote in an unsworn letter that “[properties directly adjacent to a noisy, heavily trafficked area are devalued” and that some unnamed prospective buyers were hesitant to pay fair market value for a property adjacent to the Chabad site. Her letter at best is an irrelevant generalization, too vague and nonspecific to amount to substantial evidence of anything.
 

 The Board could discount both pieces of “evidence.” The speakers were not qualified to render an expert opinion, and the statements themselves were not firsthand accounts. Wester and Bottmeyer were not in the appraisal business, and did not recite any specific experience relative to diminution in value caused by the presence of a church in an R-l zone.
 
 [14]
 
 Additionally, neither speaker took into account the effect of the nearby school and community center on property values. Finally, the statements applied only to adjacent properties, not to the community at large. Suffice it to say that whenever a noncommercial assembly use locates next door to a family home, there is a potential for some real or imagined impact on the value of that home. The legislative determination that these uses are allowed by permit is tantamount to recognizing this phenomenon and, thus, the impact analysis should focus on the neighborhood as a whole and the welfare of
 
 all
 
 persons residing there.
 

 In sum, reviewing the record as a whole, we find substantial evidence to support the Board’s findings, stated and implied, that establishment of Chabad would not be detrimental to the community from the point of view of parking, traffic, noise, and property values. In one sense the primary piece of substantial evidence is the Board resolution itself, with the limiting conditions. The conditions are beyond dispute—they are what the Board approved, and what Chabad agreed to accept. What comes through the pages of the record and the briefs is a distrust that the conditions will “work,” that Chabad will be law-abiding and respect the restrictions. The same could be said of
 
 any
 
 permittee or licensee—until tested, there is always the possibility of substantial noncompliance. The Board recognized both this possibility and the community’s fear and, therefore, adopted a stringent review clause that subjects Chabad to compliance review and the possibility of revocation after six months from the date of approval, then annually for the next three years and again every five years thereafter. Real noncompliance, not the fear
 
 *114
 
 of future noncompliance or the remembrance of past noncompliance in other settings, should be the test of the permit’s viability.
 

 VI. Parking Exception
 

 Chabad and County next attack the trial court’s conclusion that the Board abused its discretion in granting Chabad an exception to the off-street parking requirement.
 
 [15]
 
 The variance ordinance gives the Board discretion to grant an exception if there are special circumstances affecting the property; the exception is necessary to preserve and enjoy a substantial property right; strict interpretation of the regulation would be incompatible with existing improvement of adajacent properties; and granting the exception would not be detrimental to the welfare or injurious to other property. The exception can only be granted if the objectives of the regulation are still substantially achieved. (Ch. 24.15, § 24.25.010.)
 
 [16]
 
 We proceed to discuss the Board’s findings and the evidence relative to each of these factors.
 

 A.
 
 Special Circumstances
 

 The Board found special circumstances in that only two on-site parking spaces were provided during initial development of the property; it would be impossible to add more spaces without destroying the landscaping and overall amenities and violating fire access requirements; there were 64 “unclaimed” spaces in the immediate vicinity; and strict interpretation of the parking standard would make it impossible to use this property for anything except a single-family residence.
 

 The trial court viewed the hardship of providing on-site parking as self-imposed, and not due to any unique circumstances of the property.
 
 *115
 
 Homeowners contend similar language has been interpreted as emphasizing disparities between properties, not treatment of the property’s characteristics in the abstract, and as contemplating only a small fraction of any zone as qualifying for the variance.
 
 (Topanga Assn. for a Scenic Community
 
 v.
 
 County of Los Angeles
 
 (1974) 11 Cal.3d 506, 520 [113 Cal.Rptr. 836, 522 P.2d 12].) The special circumstances cited in the resolution, they argue, would apply to every residence in the neighborhood that struggled to convert to a community use.
 

 There are unique circumstances here. In an earlier case wherein the plaintiff sought to overturn a parking variance granted to an apartment developer, our Supreme Court upheld the variance as supported by the evidence because
 
 most of the tenants would not own cars. (Siller
 
 v.
 
 Board of Supervisors
 
 (1962) 58 Cal.2d 479, 485 [25 Cal.Rptr. 73, 375 P.2d 41].) The ordinance in question provided it should be construed in light of a good faith attempt to relieve traffic congestion by requiring ample parking facilities in connection with the construction of new dwellings, and allowed variances upon a showing of special circumstances and unnecessary hardship. The court reasoned that forcing the owner to provide the required number of spaces would not contribute toward relieving congestion because many of the spaces would stand vacant; this phenomenon constituted both a special circumstance and a hardship.
 
 (Id.
 
 at pp. 485-486.) The facts also showed that there were three parking garages in the area with stalls available.
 

 While the exception ordinance here varies from that of
 
 Siller,
 
 the fact remains that the court in
 
 Siller
 
 considered the driving habits of the users as a special circumstance relevant to the decision whether to grant the variance. As in
 
 Siller,
 
 it is likely that most regular users of Chabad will walk rather than drive, thus reducing the actual need for on-site spaces. That the Board did not specifically list this factor in the parking exception discussion is irrelevant because it is fully aired elsewhere in the resolution.
 

 Additionally, as County points out, it would be impossible to install 21 spaces on the Chabad lot as it stands today because most of the area is developed, with a building, patio, and pool, and the home is centrally located on the lot. The trial court held there was no lawful basis to consider the 64 off-site spaces, and then cited a lack of evidence that the exception would not prove detrimental to the community because there was already competition for the 64 spaces. We will not reiterate our review of the substantial evidence showing no parking detriment. In light of this evidence, and the impracticability of on-site construction, we conclude it was within the Board’s discretion to consider the first-come, first-served availability of the
 
 *116
 
 64 parking spaces as a special feature associated with this particular property.
 

 B.
 
 Enjoyment of Substantial Property Right
 

 Chabad has a substantial property right, as owner of the site, to use the property for any lawful purpose within the confines of the County zoning laws. It purchased the property knowing it had to qualify for the use permit. The standard for the permit is that the proposed use will not be detrimental or injurious to the neighborhood. We have already determined, without regard to the parking ordinance, that there is substantial evidence in the record that Chabad qualified for the use permit in part because the Board properly found there would be no detrimental parking impacts. The next hurdle is the parking exemption. In our view Chabad should now be deemed as having substantial rights to use the property for religious purposes, subject to fulfilling the other parking exemption requirements. To hold otherwise would make this variance requirement an absurdity whenever it is applied to an owner seeking to convert to another lawful use when the owner otherwise qualifies for the use permit and exemption.
 

 C.
 
 Strict Interpretation
 

 Strict interpretation of the parking ordinance in this case would mean erecting a parking structure on site large enough to accommodate 21 cars. As the Board reasonably found, such a structure would not be compatible with the existing neighborhood improvements, which boast landscaped yards, not expanses of concrete.
 

 D.
 
 No
 
 Detriment;
 
 [17]
 

 Substantial Adherence to Objectives
 

 The objectives of the parking ordinance, as to public safety, convenience and general welfare, are to ensure adequate parking for residents, visitors and guests, and to avoid illegal parking incidents, congestion and other unpleasant parking impacts. As the evidence shows, these goals can be substantially achieved by a combination of street parking, walking, carpooling and restricting the intensity of use. We conclude the Board did not abuse its discretion in granting Chabad an exception from the parking requirements.
 

 
 *117
 
 VII. Negative Declaration
 

 The trial court faulted the County’s negative declaration because it failed to consider future growth and expansion. It also found the County erred in failing to require an EIR based on county counsel’s erroneous advice that Chabad was entitled to a “preference.” Similarly, the court concluded that County’s findings of no significant adverse traffic and parking impacts, as well as the approved mitigation measures,
 
 [18]
 
 also derived from this same wrong advice. Chabad and County contend the Board properly approved the negative declaration, and challenge the trial court’s conclusions and rationale. We have already spoken to the matter of county counsel’s advice and the constitutional validity of the conditions. Here we focus on the growth issue as well as the evidentiary validity of the Board’s finding that the proposed use will not have a significant effect on the environment because of the adopted mitigations.
 

 A.
 
 Growth
 

 Our Supreme Court has determined that an EIR for a proposed project must include analysis of the environmental effects of future expansion if: “(1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects.”
 
 (Laurel Heights Improvement Assn.
 
 v.
 
 Regents of University of California
 
 (1988) 47 Cal.3d 376, 396 [253 Cal.Rptr. 426, 764 P.2d 278].) The trial court applied this same mandate to the approval of a negative declaration, concluding there was evidence of foreseeable growth (Chabad anticipated growth and had advertised to expand), and that such expansion would change the project’s scope and, thus, County erred in evaluating the proposed use solely in light of current attendance.
 

 We have no quarrel with the importance of analyzing future growth at the initial study stage, prior to approving a negative declaration, when such growth is reasonably foreseeable. We disagree with the trial court’s conclusion of the evidence on the foreseeability point.
 

 The initial study concluded future growth was not an issue: “The current request is for a Use Permit to permit all congregational activities to be
 
 *118
 
 consolidated and held at subject site, with a level of activity based on former and present levels of use. No permission for eventual growth is being requested at this time (other than eventual use of the second floor social hall). . . . Applicant has indicated that although the congregation has been hopeful of more growth, none of its anticipated growth has occurred thus far. Applicant therefore is requesting that the project be considered for approval essentially as it is today, and that a Condition of Approval be imposed requiring a new or amended Use Permit prior to the occurrence of any significant growth or expansion of the use.”
 

 The Board
 
 denied
 
 Chabad’s request to convert the second floor to a social hall and in its resolution bound Chabad to the maximum number of participants identified in “Exhibit A.” The permit itself controls any expansion— Chabad is subject to periodic review, and if it does not substantially comply with conditions of approval, including the caps on growth, the permit can be revoked.
 

 The trial court ignored the reality of the permit as approved and accepted, and focussed instead on earlier plans of Chabad for expansion. True, the first application projected a larger population. As Chabad’s attorney explained, these numbers were “hopeful estimations” of growth that did not occur. The trial court also cited: (1) a solicitation letter of June 1987, prior to Chabad’s purchase of the Idylberry Road facility, that exhorted: “But now it is time to expand. We have purchased a new facility to enhance our programs”; and (2) the comment of Supervisor Roumiguiere expressing concern about Chabad’s intent to establish a regional, rather than a community, synagogue. The supervisor referred to an undated advertisement that says, “Now we have a permanent home to service the entire Jewish community, regardless of affiliation or nonaffiliation.”
 

 The dreams of the rabbis and others for expansion, and past outreach efforts, are not substantial evidence that future expansion of the project,
 
 as presented to the Board,
 
 is reasonably foreseeable. Chabad submitted, and agreed to, a project with a static congregation. The one possibility of expansion, namely, conversion of the second floor into a social hall, was disapproved, with the proviso that Chabad could reapply for such conversion after the first annual review. Of course, at that time the project once again would be subjected to an initial environmental review.
 

 B.
 
 Environmental Effects
 

 Our final task is to comb the record for substantial evidence supporting a fair argument of significant effects on the environment. (See
 
 *119
 
 § 21080, subd. (c).) The term “significant effect on the environment” is defined as “a substantial, or potentially substantial, adverse change in the environment.” (§ 21068.) We find none.
 

 In the first draft of the initial study report, County planners recommended that expanded initial parking and traffic studies be conducted prior to giving environmental clearance. This study responded to the scope of the project as defined in Chabad’s original application, a scope significantly reduced over time. The final study report, reflecting reductions in attendance, intensity and frequency of events, as well as an acknowledgment of county counsel’s legal advice,
 
 [19]
 
 does not call for these studies; instead, it recommends mitigation measures designed to reduce potential traffic and parking impacts to an insignificant level.
 

 Regardless of county counsel’s advice, the question at the Board level is whether its decision to forgo further environmental review in favor of adopting a negative declaration was correct—after scaling the project down and adopting the final mitigation measures, was there still credible evidence that the project could generate substantial adverse effects? The answer is, “No.”
 

 We will not reiterate our discussion of the parking and traffic evidence. We only add that as to the traffic issue, the final study indicated that the county public works department had evaluated Chabad’s proposed figures for traffic generating potential, and determined no alteration to present circulation patterns or existing levels of street or highway service would result.
 

 Against this evidence and the evidence discussed in part V above, Homeowners cite declarations and testimony of residents that for the most part express generalized concerns and fears about traffic and parking impacts, or relate anecdotes of parking problems generated by Chabad at a different site. Witnesses also referred to the already existing competition for parking in the vicinity and relayed observances of several instances of traffic inconvenience created by Chabad drivers. This evidence, however, does not rise to the level of a fair argument that the proposed use will create a substantial, or potentially substantial, adverse change in the environment. The intensity of use, as restricted by the conditions, cannot conceivably result in such an impact. We are talking about a synagogue that will generate no more than the amount of traffic generated by three single-family homes; whose membership is comprised mainly of local residents, expected for the most part to
 
 *120
 
 walk to regular services; which is located in the immediate vicinity of 64 “unclaimed” parking spaces subject to neighborhood competition but equally available to its members on a first-come, first-served basis; and which has agreed to consider providing a shuttle service for transporting its children and to encourage members to carpool to school functions. What possible traffic or parking impacts could be unearthed by further environmental review?
 

 VIII. Conclusion
 

 This case has occasioned intense emotion and advocacy on all sides. We have emphasized that the focus must be the use, as approved, and not the feared or anticipated abuse. There is ample leeway within the permit review mechanisms to correct or obliterate any substantial abuse. Should the permit function as crafted, the tensions in this case, which on some level mirror the tension inherent in the religion clauses of our state and federal Constitutions, should abate.
 

 We reverse the judgment that directed the County and Board to vacate the resolution approving the conditional use permit and negative declaration. Parties are to bear their own costs on appeal.
 

 Poché, J., and Perley, J., concurred.
 

 The petition of plaintiffs and respondents for review by the Supreme Court was denied October 31, 1991.
 

 [1]
 

 The individual appellees are John Barnes, Karen Barnes, Ray Sullivan and Barbara Sullivan.
 

 [2]
 

 Daily prayer services are as follows: Monday-Friday, 6:30 a.m.-7:30 a.m., 10 adults; Friday evening, sunset to 9:30 p.m., 25 persons; Saturday, 9 a.m.-2 p.m., 25 persons; Sunday, 8 a.m.-9:30 a.m., 10 adults, 5 children. Seven holiday prayer services are scheduled, with attendance ranging from 15 to 50 persons.
 

 [3]
 

 All chapter references are to the Marin County Code.
 

 [4]
 

 Specifically: “In granting any use permit . . . , the zoning administrator shall designate such conditions in connection therewith as will, in his opinion, secure substantially the objectives of the regulation or provision under which such use permit is granted, as to light, air, and the public health, safety, comfort, convenience and general welfare. In all cases in which use permits are granted . . . , the zoning administrator shall require such evidence and guarantees as he may deem to be necessary that the conditions designated in connection therewith are being and will be complied with.” (Ch. 22.88, § 22.88.025.)
 

 [5]
 

 Public Resources Code section 21168 provides; “Any action or proceeding to . . . review ... a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure. [¶] In any such action, the court. . . shall only determine whether the act or decision is supported by substantial evidence in light of the whole record.”
 

 Unless otherwise indicated, all further statutory references are to the Public Resources Code.
 

 [6]
 

 Of interest is the court’s dismissal of the appeal in
 
 Corporation of Presiding Bishop
 
 for want of a substantial federal question.
 
 (Corporation of Presiding Bishop
 
 v.
 
 City of Porterville
 
 (1949) 338 U.S. 805 [94 L.Ed. 487, 70 S.Ct. 78].) Justice Vinson, writing in a later case, explained: “We recently dismissed for want of substantiality an appeal in which a church group contended that its First Amendment rights were violated by a municipal zoning ordinance preventing the building of churches in certain residential areas.”
 
 (Communications Assn.
 
 v.
 
 Douds
 
 (1950) 339 U.S. 382, 397-398 [94 L.Ed. 925, 942-944, 70 S.Ct. 674].)
 

 [7]
 

 The Ninth Circuit appears to engage in a balancing of interests, with the corollary analysis of whether the state’s interest is compelling, regardless of the nature of the burden on free exercise. This approach does not completely mesh with modern United States Supreme Court theory, as encapsulated in a recent unanimous opinion: “Our cases have established that ‘[t]he free exercise inquiry asks whether government has placed a
 
 substantial burden on the observation of a central religious belief or practice and, if so,
 
 whether a compelling governmental interest justifies the burden.’ ”
 
 (Swaggart
 
 v.
 
 Calif. Equalization Bd.
 
 (1990) 493 U.S. 378, 384 [107 L.Ed.2d 796, 806, 110 S.Ct. 688], italics added.) Further, the high court has made it clear that the free exercise clause has bounds: “ ‘The Free Exercise Clause affords an individual protection from certain forms of government compulsion; it does not afford an individual a right to dictate the conduct of the Government’s internal procedures.’ ”
 
 (Lyng
 
 v.
 
 N.W. Indian Cemetery Prot. Asso.
 
 (1988) 485 U.S. 439, 448 [99 L.Ed.2d 534, 546, 108 S.Ct. 1319], quoting
 
 Bowen
 
 v.
 
 Roy
 
 (1986) 476 U.S. 693, 699-700 [90 L.Ed.2d 735, 744-745, 106 S.Ct. 2147].) Thus, the government will only be required to bring forward a compelling justification when its actions involve direct or indirect coercion, as for example the imposition of fines or penalties on the free exercise of religion.
 
 (Id.
 
 at pp. 450-451, 457 [99 L.Ed.2d at pp. 547-548, 551-552].)
 

 [8]
 

 We can conceive that what might be viewed as accommodation under federal law would be an illegal preference in this state. In California, it appears the zone of religious accommodation does not extend beyond what is necessary to avert discrimination or prevent a free exercise abuse. On the other hand, the federal establishment clause allows some accommodation beyond what is mandated by the free exercise clause.
 

 [9]
 

 This is the standard for granting a conditional use permit, as found in chapter 22.88, section 22.88.020(4).
 

 [10]
 

 This condition reads: “A ceremonial or celebratory function or event shall be conducted for the benefit of, or on behalf of, sustaining members of the congregation or their families.”
 

 [11]
 

 This figure includes 10 life-cycle events which the permit requires to be conducted for the benefit of sustaining members, i.e., those living in the immediate neighborhood.
 

 Staff initially recommended that
 
 all
 
 attendees at
 
 all
 
 events be limited to Lucas Valley residents, and then refined the recommendation to require a majority of local attendees. After input from Chabad and county counsel, the strict residence restriction for special events was eliminated. Nevertheless, relying on common sense, the Board could reasonably consider that most special event participants would be Lucas Valley residents, many of whom would walk, since the active, sustaining membership is made up of 64 persons (35 adults and 29 children) living within walking distance of Chabad.
 

 [12]
 

 In an internal memo, Mansourian stated that the latest Chabad submittal identified its scope as limited to 20 families living in the Lucas Valley area.
 

 [13]
 

 According to the July 1988 draft initial study report, a study was recommended in order to analyze daily and peak hour trip generation and the impact of these trips on the existing level of service and safety at the Lucas Valley Road/Mt. Lassen intersection. The department of public works had documented a history of accidents at that intersection; a recent traffic study showed that a traffic signal was warranted there.
 

 [14]
 

 On the other hand, a rabbi from Palo Alto testified his synagogue had no impact on prices, and Chabad’s rabbi testified his own home had increased in value.
 

 [15]
 

 We point out that the County engineer who originally reviewed Chabad’s request for a parking exception concluded an exception was not warranted, and observed that the department of public works had not granted exceptions to other churches. However, he also saw no need for an exception if
 
 only
 
 neighborhood residents were to participate in Chabad events because the parking impact would be minimal.
 

 [16]
 

 The exact wording of the required findings is as follows: “(a) That there are special circumstances or conditions affecting said property, including but not limited to topography, geology, etc.; (b) That the exception is necessary for the preservation and enjoyment of a substantial property right of the petitioner; (c) That the strict interpretation of the chapter would not be compatible with the existing improvements of adjacent, already developed property; (d) That the granting of the exception will not be detrimental to the public welfare or injurious to other property in the territory in which said property is situated, [f] In granting such exceptions, the objectives of the regulations to which the exceptions are granted, as to light, air and the public health, safety, convenience, ecology and general welfare, shall be substantially achieved. . . .” (Ch. 24.15, § 24.15.010.)
 

 [17]
 

 See discussion in part V.B. above, concluding there was substantial evidence in the record as a whole that the project would not be detrimental to the community or injurious to other property.
 

 [18]
 

 We are puzzled by the trial court’s statement that changes in mitigation occurred over the planning period because of county counsel’s advice that Chabad was entitled to a preference. But that is irrelevant. We are here reviewing the decision of the Board. The questions at this level are: Are the conditions valid (yes); did county counsel’s advice prejudicially infect the Board’s decisionmaking process (no); and does the evidence support its decision?
 

 [19]
 

 At one point county counsel advised the planning director that County does not have authority to require an EIR to study the parking question.