[No. A070588. First Dist., Div. Five. Feb. 25, 1997.]

FRIENDS OF THE OLD TREES, Plaintiff and Respondent, v.
DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al.,
Defendants and Appellants;
BRUCE L. VAN ALSTYNE et al., Real Parties in Interest and Appellants.

1384

**COUNSEL**

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Charles W. Getz IV, Assistant Attorney General, and John Davidson, Deputy Attorney General, for Defendants and Appellants.

Zumbrun & Findley, Ronald A. Zumbrun and John H. Findley for Real Parties in Interest and Appellants.

Paul V. Carroll for Plaintiff and Respondent.

## OPINION

CHAMPLIN, J.*—By petition for writ of mandate, respondent Friends of the Old Trees (Friends) challenged the approval by appellant California Department of Forestry and Fire Protection (the Department) of a modified timber harvest plan (THP) prepared and submitted by real party in interest Bruce L. Van Alstyne (Van Alstyne). The trial court granted the writ, concluding the Department's approval of the plan required a cumulative impacts analysis and a discussion of alternatives to the project. The Department and Van Alstyne both appeal from this ruling.[1] Although we have followed a different analytical path, we agree with the trial court that by approving the plan without the necessary information regarding cumulative impacts and project alternatives, the Department abused its discretion.

In reaching this conclusion, we announce several holdings important to judicial review of modified THP's filed pursuant to California Code of Regulations, title 14,[2] sections 1051 and 1051.1. (1) Judicial review of the Department's approval of a modified THP should proceed by administrative mandamus (Code Civ. Proc., § 1094.5), and the review should ordinarily be confined to the administrative record. (2) The automatic incorporation of mitigation measures as a prerequisite for approving a modified THP does not grant a blanket exemption from the normal requirements for drafting a legally sufficient THP. (3) In reviewing the agency's decision that the proposed timber harvesting is unlikely to cause a significant adverse impact to the environment, the court should independently examine the administrative record to determine if there is substantial evidence to support a fair argument that the proposed timber operations will have significant individual or cumulative impact on the environment.

---

*Judge of the Napa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]Van Alstyne and the Department have filed separate briefs in this matter. In arguments that are made by both Van Alstyne and the Department, they will be collectively referred to as appellants. Arguments that are advanced by a party individually will be identified by the party's name.

[2]All subsequent references to Regulations will be to the California Code of Regulations, title 14.

*Facts*

On March 16, 1994, Van Alstyne, through a registered professional forester, submitted to the Department a modified THP seeking approval to selectively harvest 35 acres of trees on his property located near Occidental in Sonoma County. The stand is described as a dense redwood forest with almost 100 percent crown closure. It is 90 percent redwood and 10 percent Douglas fir and hardwoods. The forest was to be selectively harvested, with approximately 20 to 25 percent of the trees over five feet in diameter to be cut. The selective harvest involves removal of individual trees growing among other trees for the purpose of providing extra room for the continued growth of the trees which are retained. The last significant harvest in the stand was 100 years ago. The next harvest is expected to be in 12 to 15 years.

Under the Z'Berg-Nejedly Forest Practice Act of 1973, hereafter Forest Practice Act (Pub. Resources Code,[3] § 4511 et seq.) and its implementing regulations, hereafter Forestry Rules (Regs., § 895 et seq.), Van Alstyne's planned logging, like all similar logging in the state, was subject to the Department's approval of a site specific THP. (See § 4581; *Sierra Club* v. *State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1226-1227 [32 Cal.Rptr.2d 19, 876 P.2d 505] (*Sierra Club*); *Environmental Protection Information Center, Inc.* v. *Johnson* (1985) 170 Cal.App.3d 604, 609 [216 Cal.Rptr. 502] (*EPIC*).) The THP preparation and approval process is the functional equivalent of the preparation of an environmental impact report (EIR) contemplated by the California Environmental Quality Act (CEQA) (§ 21000 et seq.) (*EPIC, supra,* at p. 611.) Van Alstyne submitted a modified THP under Regulations, sections 1051 and 1051.1. In order to file a modified THP, the plan submitter must own 100 acres or less and meet specified conditions which are designed to avoid and mitigate significant adverse environmental effects. (See Regs., § 1051, subd. (a)(1)-(16).)

The proposed logging generated significant public interest, which was demonstrated by more than 250 letters from concerned members of the public protesting the plan and seeking further information. After the Department approved Van Alstyne's THP, Friends petitioned for a writ of mandamus. The superior court issued the writ on a finding that the Department had abused its discretion by approving the THP without an assessment of cumulative impacts or project alternatives. Van Alstyne was enjoined from harvesting trees on the property until there was approval of a THP consistent with the court's decision.

---

[3]All statutory references are to the Public Resources Code unless otherwise indicated.

*Admission of Extra-record Evidence*

■ Appellants contend the trial court erred in expanding the scope of the evidence it considered beyond the administrative record. The challenge is specifically directed at the trial court's admission and reliance on five declarations written after the Department's administrative review had been completed expressing concern that the proposed timber harvesting would deleteriously affect the local water supply. The crux of this contention is that the trial court erred in treating this matter as a Code of Civil Procedure section 1085 traditional mandamus, thereby allowing the admission of extra-record declarations prepared after the Department concluded its review.

Legal challenges to an environmental determination "made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency," are governed by section 21168. Such actions must be brought as administrative mandamus proceedings under Code of Civil Procedure section 1094.5. (*Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 566-567 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*).) Section 21168.5 applies to "any action or proceeding, other than an action or proceeding under Section 21168 . . . ." Case law establishes that actions subject to section 21168.5 must be filed as ordinary or "traditional" mandamus proceedings under Code of Civil Procedure section 1085. (*Western States, supra,* 9 Cal.4th at pp. 567-568; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).)

■ Quasi-legislative acts are ordinarily reviewed by traditional mandate, and quasi-judicial acts are reviewed by administrative mandate. (*Western States, supra,* 9 Cal.4th at pp. 566-567.) "Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts." (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].)

■ Review under administrative mandamus (§ 21168) and review under traditional mandamus (§ 21168.5) share many of the same characteristics. There is no practical difference between the standards of review applied under traditional or administrative mandamus.[4] (*Gentry* v. *City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375 [43 Cal.Rptr.2d 170] (*Gentry*).) The

---

[4]Under section 21168, the reviewing court determines "whether the act or decision is supported by substantial evidence in the light of the whole record." By contrast, section

remedies available remain the same. (*Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 673-674 [170 Cal.Rptr. 484, 620 P.2d 1032].) The critical distinction for our purposes is the record available for review. When an agency's quasi-judicial determination is reviewed by administrative mandamus, judicial review is generally limited to the evidence in the record of the agency proceedings. (See § 21168; Code Civ. Proc., § 1094.5, subd. (c).) By recent Supreme Court authority which worked a substantial change in the law, when an agency's quasi-legislative decision is reviewed by traditional mandamus, judicial review is also ordinarily limited to the administrative record. (*Western States, supra,* 9 Cal.4th at p. 576.) However, if the action challenges a ministerial or informal administrative action and the facts are in dispute, extra-record evidence may be necessary for adequate review "because there is often little or no administrative record in such cases." (*Id.* at p. 575.)

The question of whether the petition was properly one for administrative or traditional mandamus was resolved by the trial court in favor of traditional mandamus on the basis that the notice and public comment provisions of the Forestry Rules did not amount to a hearing required by law in which evidence is required to be taken as required by Code of Civil Procedure section 1094.5, subdivision (a), and section 21168.[5] Relying on *No Oil, Inc.* v. *City of Los* Angeles (1974) 13 Cal.3d 68, 79, footnote 6 [118 Cal.Rptr. 34, 529 P.2d 66] (*No Oil*), the trial court obviously believed that once this matter was classified as one in traditional mandamus, the record could automatically be opened for additional evidence.

However, in *Western States,* the court specifically disapproved of the language in *No Oil* relied upon by the trial court and soundly rejected this automatic approach to opening up the record for additional evidence. (*Western States, supra,* 9 Cal.4th at pp. 575-576.) As noted, *Western States* was a

21168.5 provides that a reviewing court's inquiry "shall extend only to whether there was a prejudicial abuse of discretion," and states that "[a]buse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." Despite the difference in language, courts have held that the standard of review under the two statutes is essentially the same. (*Western States, supra,* 9 Cal.4th at p. 573; *Laurel Heights, supra,* 47 Cal.3d at p. 392, fn. 5.)

[5]At this juncture, it should be noted that section 4582.7, subdivision (c), requires a public hearing when a THP submitter appeals the Department's rejection of the plan to the State Board of Forestry. In such a scenario, the hearing requirement of section 21168 is clearly met and the Board's ultimate approval or rejection of the THP is subject to judicial review under the mandate procedure established by Code of Civil Procedure section 1094.5. (*Sierra Club, supra,* 7 Cal.4th at pp. 1235-1236.) The issue in this case arises because applicants whose THP's are initially approved by the Department, such as Van Alstyne, are not similarly entitled to a public hearing.

traditional mandamus action reviewing an administrative rulemaking body's alleged failure to comply with CEQA. After considering CEQA as a whole, the court was "left without any doubt that the Legislature intended courts to generally consider only the administrative record in determining whether a quasi-legislative administrative decision was supported by substantial evidence." (9 Cal.4th at p. 571.) The court went on to explain: "Were we to hold that courts could freely consider extra-record evidence in these circumstances, we would in effect transform the highly deferential substantial evidence standard of review in Public Resources Code section 21168.5 into a de novo standard, and under that standard the issue would be not whether the administrative decision was rational in light of the evidence before the agency but whether it was the wisest decision given all the available scientific data." (*Id.* at p. 572.)

While Friends attempt to distinguish *Western States* on numerous grounds, it cannot escape the broad reasoning the Supreme Court used to support its decision. In restricting review of a quasi-legislative decision to the administrative record, the court's overriding concern was that the consideration of extra-record evidence would empower the court to engage in independent factfinding rather than engaging in a review of the agency's discretionary decision. Differences aside, there can be no doubt that *Western States* substantially weakens Friends' position in support of the consideration of extra-record evidence in this case.

Nor are we persuaded by Friends' argument that extra-record evidence is required to permit adequate review because the Department's THP ruling was simply an "informal" administrative decision made as a result of a proceeding which did not require the taking of evidence or a verbatim transcript of the proceedings. (See *Western States, supra,* 9 Cal.4th at p. 576.) This decision was not made in a bureaucratic vacuum leaving an inadequate paper trail, as the 600-plus page administrative record demonstrates. Significantly, courts and commentators have found that purely documentary proceedings can satisfy the hearing requirement of Code of Civil Procedure section 1094.5, so long as the agency is required by law to accept and consider evidence from interested parties before making its decision. (See *Poschman* v. *Dumke* (1973) 31 Cal.App.3d 932, 938 [107 Cal.Rptr. 596], disapproved on other grounds in *Armistead* v. *State Personnel Board* (1978) 22 Cal.3d 198, 204, fn. 3 [149 Cal.Rptr. 1, 583 P.2d 744]; *Mahdavi* v. *Fair Employment Practice Com.* (1977) 67 Cal.App.3d 326, 334 [136 Cal.Rptr. 421] [compilation of cases holding that a hearing within the meaning of Code of Civil Procedure section 1094.5 may be a purely documentary proceeding]; 2 Kostka & Zischke, Practice Under the Cal.

Environmental Quality Act (Cont.Ed.Bar 1996) § 23.45, pp. 961-962; see also *Eureka Teachers Assn.* v. *Board of Education* (1988) 199 Cal.App.3d 353, 362 [244 Cal.Rptr. 240].) It is noteworthy CEQA itself "does not require formal hearings at any stage of the environmental review process. Public comments may be restricted to written communications." (Regs., § 15202, subd. (a).)

Because the Department's approval of a THP provides numerous opportunities for public and agency input, and the Department is under an obligation to respond in writing to environmental concerns, we believe the Department's THP review process fully satisfies the hearing requirement of Code of Civil Procedure section 1094.5, subdivision (a), and section 21168.[6] While the Department is not required to hold a trial-type hearing, compliance with the legislative requirements governing the review process guarantees the views of the plan's supporters and detractors will be sufficiently documented to permit judicial review.

Consequently, in the future, we believe courts should review the Department's approval of a THP by administrative mandamus (Code Civ. Proc., § 1094.5) and that review should ordinarily be confined to the administrative record. We are not alone in this conclusion. In *East Bay Mun. Utility Dist.* v. *Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113 [51 Cal.Rptr.2d 299], the court recently stated: "The focus in an action for administrative mandamus is upon the application of a regulatory scheme to a specific set of facts. [Citation.] Thus, approval or disapproval by [the Department] of specific THP's is normally challenged by way of a petition for administrative mandamus." (*Id.* at p. 1121.) In another part of the opinion, the court goes on to explain "Thus in an administrative mandamus action which challenges a THP approval for chopping down all the trees on Blackacre, *the approval will be supported or not by the record before the agency.*" (*Id.* at p. 1123, italics added.)

What is the effect of the trial court's approach in treating this matter as one under traditional mandamus and considering the extra-record evidence

---

[6]Under the terms of the Forest Practice Act, public notice of the filing of a THP is required (§ 4582.4; Regs., § 1037.1), and the plan must be made available for public review and comment (§ 4582.6). The process also provides for consultation with certain public agencies, including the Department of Fish and Game, the appropriate California regional water quality control board, and the pertinent county planning agency. (§ 4582.6; Regs., § 1037.3.) The Department must "review the public input, to consider recommendations and mitigation measures of other agencies, [and] to respond in writing to the issues raised . . . ." (§ 4582.7, subd. (a).) If the Department approves the plan, it issues a notice of approval which must include a "written response . . . to significant environmental issues raised during the evaluation process," including those raised by members of the general public. (Regs., § 1037.8.)

in rendering its decision? Despite the space in the briefs devoted to this topic and considering appellants' impassioned arguments urging reversal, the answer is, at this stage, the issue is purely academic. We are not undertaking a review of the trial court's findings or conclusions. Instead, "we review the matter *without reference to the trial court's actions.* In mandamus actions, the trial court and appellate court perform the same function. . . ." (*McGill* v. *Regents of University of California* (1996) 44 Cal.App.4th 1776, 1786 [52 Cal.Rptr.2d 466], citation omitted, italics added; *Gentry, supra,* 36 Cal.App.4th at pp. 1375-1376; *Desmond* v. *County of Contra Costa* (1993) 21 Cal.App.4th 330, 334-335 [25 Cal.Rptr.2d 842].) In conducting our de novo review, the applicable record will be redefined and reevaluated. Thus, it is difficult to see how appellants are presently aggrieved by the trial court's decision to admit extra-record evidence.

*Overview*

Since the Department vigorously objects to Friends' frequent invocation and "misplaced reliance" on CEQA precedent, we find it necessary at the outset to summarize the well-defined relationship between the Forest Practice Act and CEQA. In *EPIC*, we held that, with the exception of certain specific provisions of CEQA relating to the "procedural elements" of the EIR process, "CEQA and its substantive criteria for the evaluation of a proposed project's environmental impact apply to the timber harvesting industry, and are deemed part of the [Forest Practice Act] and the Forestry Rules." (*EPIC, supra,* 170 Cal.App.3d at pp. 617, 620; see also Regs., § 15250.) The Supreme Court has recently reiterated that timber harvesting is not exempt from adhering to the broad policy goals of CEQA. To the contrary, the court held "that in approving timber harvesting plans, the [administrative body] must conform not only to the detailed and exhaustive provisions of the [Forest Practice] Act, *but also to those provisions of CEQA from which it has not been specifically exempted by the Legislature.*" (*Sierra Club, supra,* 7 Cal.4th at p. 1228, italics added.)

Significantly, the Forest Practice Act and the Forestry Rules establish a statutory and regulatory framework that, construed together with CEQA, confers on the Department the obligation to see that cumulative impacts and alternatives to the project, as well as other specified environmental information, be taken into consideration in evaluating THP's. CEQA specifically provides that a document written in lieu of an EIR, such as a THP, and submitted to a certified regulatory agency, such as the Department, include "a description of the proposed activity with alternatives to the activity." (§ 21080.5, subd. (d)(3)(A).) In *Sierra Club,* the Supreme Court stated that

the THP must "include a description of the proposed activity, *its alternatives*, and mitigation measures to minimize any significant adverse environmental impact . . . ." (*Sierra Club*, *supra*, 7 Cal.4th at p. 1230, italics added.) Moreover, the forestry rules governing the preparation of THP's require that the cumulative impact of the proposed timber harvesting be considered as a substantive criterion for evaluating the environmental impact of the proposed project. (Regs., §§ 898, 912.9.) In *EPIC*, we defined a cumulative effect as an assessment of "cumulative damage as a whole greater than the sum of its parts." (*EPIC*, *supra*, 170 Cal.App.3d at p. 625.) Quoting CEQA guidelines, *EPIC* went on to explain that a cumulative effect is two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts. (*Ibid.*) Echoing these principles, under the forestry rules, THP's must include information not only about the proposed project but about "closely related past, present and reasonably foreseeable probable future projects." (Regs., § 898.)

Nor do we agree with the Department that a narrow reading of these requirements is justified by the fact that Van Alstyne submitted a modified THP, which automatically imposes numerous mitigation measures as a condition for plan approval. (Regs., § 1051, subd. (a)(1)-(16).) While the mitigation measures incorporated into these regulations are important first steps toward accomplishing the high environmental objectives sought to be achieved by the THP review process, their implementation does not grant a blanket exemption from the normal requirements for drafting a legally sufficient THP. To the contrary, the forestry rule setting out the 15 mitigation measures that must be met as a condition for filing a modified THP ends with the following admonition: "In addition to (1)-(15) *all other rules of the Board shall apply to operations specified in this section.*" (Regs., § 1051, subd. (a)(16), italics added.)

This conclusion is bolstered by the parties' responses to several issues that we ordered supplementally briefed after oral argument. The issues focused on whether the automatic incorporation of mitigation measures as a prerequisite for a modified THP's approval should be construed as relaxing the amount of information necessary to enable the Department to properly evaluate the environmental impact of the proposed logging operation.

By supplemental briefing, the Department and Friends appear to agree that the blanket exemption for CEQA review authorized by Regulations, section 15061, subdivision (b)(3), would not be applicable to modified THP's. That exemption applies only to activities "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant

effect on the environment." The Department acknowledges "[i]t would be difficult to argue that any THP—even a modified THP subject to a substantial list of mandatory mitigation measures—would fall within this very limited exception." The Department goes on to point out that as a result of the automatic "front loading" of an exhaustive list of mitigations, Regulations section 1051.1, subdivision (d), creates a rebuttable presumption that significant adverse impacts are unlikely to result from the proposed project unless "a fair argument" is raised to the contrary necessitating further environmental review. The Department persuasively reasons "[w]ere the exemption authorized by section 15061, subdivision (b)(3), made applicable, however, the opportunity to present substantial evidence necessary to establish such a fair argument would be denied. This would neither be consistent with CEQA or in the best interests of environmental protection."

Significantly, the Department and Friends also agree that failure to raise a "fair argument" pursuant to Regulations section 1051.1, subdivision (d), does not exempt the requirement that feasible alternatives be discussed as part of a modified THP review. We accept the Department's concession that a legally sufficient modified THP must include some consideration of feasible alternatives even if the project's significant environmental impacts will be avoided through mitigation measures.

Finally, the Department and Friends agree that where a "fair argument" has been raised requiring the THP to undergo supplemental environmental review, the amended modified THP would once again be subject to public review and comment as required by the Forest Practice Act and the forestry rules. Consequently, with all of these issues in mind, we can say with assurance that the law governing modified THP's, while reducing the regulatory burden on the modified THP submitter, does not allow for important environmental considerations to be swept under the rug.

*Cumulative Impacts Analysis*

We first consider whether the Department prejudicially abused its discretion by failing to require a cumulative impacts assessment. Because Van Alstyne proceeded under a modified THP which automatically imposed numerous mitigation measures, he was entitled to the benefit of the rebuttable presumption set out in Regulations section 1051.1, subdivision (d), that the proposed timber harvesting was "unlikely to cause a significant adverse impact to the environment." However, "[t]his presumption of unlikely impacts shall not apply to [Modified] THP's for which . . . the Director determines in consultation with trustee or responsible agencies, or upon

review of public comments that *a fair argument exists* that significant individual or cumulative impacts will result from timber operations. Where *issues (a fair argument) are raised*, the [registered professional forester] shall complete the appropriate portion of Technical Rule Addendum No. 2[7] and submit that information for the Director's review." (Italics added.) The record reflects that the Department agreed with the conclusion of Van Alstyne's registered professional forester that no formal cumulative impacts analysis was necessary as part of the THP because "[t]he cumulative impacts assessment . . . [is] addressed in an alternative manner using the 16 specified restrictive mitigation and conditions of 14 CCR 1051(a) 1-16."

We are confronted at the outset by what test should be applied in reviewing the Department's decision not to require a cumulative impacts analysis. The Department argues that the agency's decision under Regulations section 1051.1, subdivision (d), must be upheld if it is supported by substantial evidence in the administrative record. Friends argues that we should undertake an independent review of the record to determine whether there is substantial evidence in support of a fair argument that the proposed timber operations will have a significant individual or cumulative impact to the environment. By practical effect, if we endorse the Department's view, we review the record for substantial evidence supporting the agency's decision that the proposed timber harvesting is unlikely to cause a significant adverse impact to the environment. If we endorse Friends' view, we review the record for substantial evidence supporting a fair argument of significant environmental effect. As the trial court noted, this appears to be an issue of first impression.

By agreement of the parties, the "fair argument" test used in this case was derived from the test used to review rulings under section 21151 of CEQA. Under this test, the agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a proposed project may have a significant effect on the environment. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502].) In reviewing this issue in the CEQA context, ". . . the appellate court must look to the administrative record and decide whether or not there is substantial evidence supporting a fair argument that the project may have a significant adverse impact upon the environment. If such substantial evidence exists, or reasonable inferences

---

[7]Technical Rule Addendum No. 2 (Rule 2) states that its purpose is to "guide the assessment of cumulative impacts . . . that may occur as a result of proposed timber operations," and requires, among other things, the "evaluation of both on-site and off-site interactions of proposed project activities with the impacts of past and reasonably foreseeable future projects." (Regs., § 912.9.)

therefrom, preparation of an EIR is mandatory. Consideration is not to be given contrary evidence . . . ." (*Citizens' Com. to Save Our Village* v. *City of Claremont* (1995) 37 Cal.App.4th 1157, 1168 [44 Cal.Rptr.2d 288]; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 244-245 [227 Cal.Rptr. 899]; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514].)

We conclude that the decision not to require a timber harvester to prepare a cumulative impacts analysis is governed by the same "fair argument" test as the decision not to prepare an EIR under section 21151 and not by the deferential substantial evidence standard of review advocated by the Department. While, to our knowledge, we are the first court to so hold, we note that it has been suggested that where a statutory exemption depends on whether the project will have significant environmental effects (as does Regulations section 1051.1, subdivision (d)), an independent assessment of the record is warranted in reviewing an agency's determination that the statutory exemption applies. (See *Gentry, supra,* 36 Cal.App.4th at p. 1406, fn. 24; *Western Mun. Water Dist.* v. *Superior Court* (1986) 187 Cal.App.3d 1104, 1113 [232 Cal.Rptr. 359], disapproved on other grounds in *Western States, supra,* 9 Cal.4th at p. 570, fn. 2; but see *Centinela Hospital Assn.* v. *City of Inglewood* (1990) 225 Cal.App.3d 1586, 1601 [275 Cal.Rptr. 901].)

■ Therefore, the Department's approval of the THP required a cumulative impacts analysis pursuant to Regulations section 1051.1, subdivision (d), if substantial evidence in the record supports a fair argument that significant individual or cumulative impact will result from the proposed timber operations.[8] We have conducted a de novo review of the administrative record as the trial court's findings on the "fair argument" issue are not dispositive. (*Stanislaus Audubon Society, Inc.* v. *County of Stanislaus* (1995) 33 Cal.App.4th 144, 151 [39 Cal.Rptr.2d 54] (*Stanislaus*).) We have not considered any extra-record evidence submitted by any party. Both sides have vigorously argued their perspectives of the record.

In discharging its obligation to point out substantial evidence in the record supporting a fair argument that Van Alstyne's proposed timber harvesting

---

[8] We are given clear, definitive guidance to the meaning of "substantial evidence" as used in CEQA. Substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Regs., § 15384, subd. (a); see *Laurel Heights, supra,* 47 Cal.3d at p. 393.) Substantial evidence includes facts, reasonable assumptions based on fact, and expert opinion supported by facts. On the other hand, "argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, [is not substantial evidence]." (§ 21080, subd. (e)(2).)

would have a significant individual or cumulative impact on the environment, Friends points to numerous letters from the public, expressing concern that the proposed logging would adversely affect the supply of water available to local wells, springs and other water sources.[9] Some individuals relied on a paper written by Steven A. Harris (Harris, *Relationship of Convection Fog to Characteristics of the Vegetation of Redwood National Park* (May 1987) [unpublished thesis presented to Humboldt State University]) (hereafter the Harris paper), included in the administrative record, which is a compilation of scientific research regarding the phenomenon of fog drip. Fog drip is described as a process in which trees capture moisture from fog, which then drips to the forest floor. The letters express the general concern that the proposed logging would reduce this fog drip and add to the local shortage of groundwater. The Harris paper documents precipitation in the form of fog drip within redwood forests can produce significant amounts of water to the soil depending on certain variables, including a stand's physical characteristics and locale. While it is true, as our dissenting colleague points out, that the Harris paper did not specifically address the site under review, it nevertheless added credence to the concern repeatedly raised by the public that the proposed logging had the potential of further reducing groundwater that was already in short supply.

Interestingly enough, the Department placed its confidence in a study which basically reiterated the basic points made in the Harris paper. In its official response, the Department relied heavily on the Keppeler study (Keppeler & Ziemer, *Logging Effects on Streamflow: Water Yield and Summer Low Flows at Caspar Creek in Northwestern California* (July 1990) 25 Water Resources Research 1669) for the proposition that logging ordinarily. *increases* the water supply by eliminating trees and reducing evapotranspiration. But the Keppeler study itself acknowledges an "important contradiction in the pattern of increased flows after logging" in areas with a high frequency of fog and discusses various studies which have attributed reduced water flows after logging to the reduction of fog drip. (P. 1670.) The Keppeler study indicates that "[t]hese results suggest that by the elimination of fog drip through the removal of forest vegetation, anticipated enhancement of summer flows may not be realized in areas where fog occurrence is a frequent source of significant moisture." (*Ibid.*) The Keppeler study goes on to cite four other studies in support of the following proposition: "The

---

[9] "A project will normally have a significant effect on the environment if it will . . . [s]ubstantially degrade or deplete ground water resources . . . ." (Regs., § 15000 et seq., appen. G, subd. (h).) The forestry rules define a "significant" impact on the environment to be "a substantial, or *potentially substantial*, adverse change in any of the physical conditions within the area affected by the project including land, air, *water*, minerals, flora, fauna, . . ." (Regs., § 895.1, italics added.)

occurrence of fog and its role in influencing moisture conditions in coastal California and Oregon has been well documented, leading support to the hypothesis that significant amounts of moisture can be delivered in areas with a high frequency of advected fog." (*Ibid.*) In sum, the Keppeler study—which was relied upon by the Department as hoped-for support for its position—provides substantial evidence in support of the fair argument raised by the public.

Dr. Daniel E. Wickham appeared at one of the review team meetings.[10] His comments were transcribed and appear in the administrative record. Because his views are important to our decision on this issue, we set them out in some detail. After citing the Harris paper and noting that the proposed harvesting was in an area that suffers from documented water scarcity, Dr. Wickham went on to indicate that "throughout all of the research that has been done here and that can be very specifically looked at in written testimony, it's very, very clear that the contribution of water through fog drip in redwood locations to the soil moistur[e] ranges anywhere from significant to spectacular, according to most of the actual written research. In redwood, the drip ranges anywhere from about 1 1/2 inches per month to 6

[10]The dissent denigrates Dr. Wickham's knowledge, experience, training and education and pronounces him incompetent to render an opinion on whether the proposed timber harvest might affect the water supply. In our view, the dissent measures Dr. Wickham's qualifications to render an opinion by standards usually reserved for witnesses at trial testifying as experts rather than for members of the public attempting to bring environmental concerns to the attention of an administrative agency. Based on the following qualifications, we believe Dr. Wickham possessed sufficient knowledge and expertise so that his comments at the review team meeting rose to the dignity of *substantial evidence supporting a fair argument* that the proposed timber harvesting would generate significant environmental effect.

Dr. Wickham's declaration states that he received a Ph.D. from the zoology department of the University of California at Berkeley studying the ecology of marine ecosystems. For 18 years he was a research ecologist on the staff at the University of California, Bodega Marine Laboratory. He pursued studies on the unique role that the ocean shore plays in shaping the California coastal ecosystem. (The timber grove at the center of this controversy is located just three miles from the Pacific Ocean.) Dr. Wickham is currently licensed by the State of California as a registered environmental assessor.

Of significance to his qualifications to render an opinion on the potential effect of this timber harvest on the water supply in this coastal area of Sonoma County, Dr. Wickham has been involved in studies relating to water use issues in Sonoma County and was cofounder and served on the technical advisory group overseeing the development of the Santa Rosa Subregional Wastewater System. This position exposed him to many technologies which relate to water conservation and reuse. Dr. Wickham also has direct knowledge of the locale and physical characteristics of the grove designated for harvesting. He lives five miles from the grove and has personally visited it on several occasions.

In light of Dr. Wickham's firsthand knowledge of the area, his expertise upon issues relating to water supply, and his involvement in Sonoma County water use issues, we believe he is qualified to assess the impact of this proposed timber harvesting on the local water supply and to render an opinion thereon.

1/2 inches per month in these areas as contributing to the soil. The issue here, this particular stand, because it is near the ocean, it is likely to be exposed to significantly more fog than most other stands further inland. It also consists of very, very tall and large trees which are the predominant ones that act to condense moisture from the fog. The cutting of those large trees could impact that water table very significantly and for them to go ahead on the assumption that it won't or on the notion that some general research has shown that it's a controversial topic, it's really necessary for a timber harvest plan to go forward with an actual specific study of that particular grove to see exactly what the condition is, because it's a water scarce area." He expressed a concern that the present harvesting plan, in combination with other surrounding land use activities, including a vineyard, would cumulatively impact the water table.

Dan E. Steimle, a property owner near the grove of trees intended for harvest, wrote to the Department expressing his concern that the proposed logging would adversely effect ". . . the watershed and the availability of ground water serving the wells that support the various homes and home sites in the area." He attached a 13-page report on the water conditions in the area prepared by a geologist which assertedly demonstrated "a correlation between the producing wells and the grove of trees intended for harvest." Furthermore, he noted that "from the reading of the report, there may also be a correlation between the grove of trees and the sub ground structure that supports the producing wells." He concluded with this observation: "While not conclusive in its own right, this information should be given serious consideration in the determination of the proposed harvest and its impact that could be felt on what is already a scarce water table."

Ernest L. Carpenter, a member of the Sonoma County Board of Supervisors, sent a letter to the Department outlining numerous concerns which had been brought to his attention by his constituents. He indicated that the "neighbors have raised the issue of the impact of this plan upon the watershed and their respective water supplies." He goes on to state: "Although I have no direct personal knowledge of these interrelationships, it is a water scarce area and there is not enough water at this time to serve all residents, agricultural operations, and residents to come." His letter concludes with the following request, "Please answer to the satisfaction of the neighbors the impact of this timber harvest plan upon water availability."

The dissent believes any fair argument raised by the public can be dismissed as speculative and unfounded when viewed against the Department's "site specific, scientifically based evidence that shows this modified

THP would not adversely affect the water supply . . . ." (Conc. & dis. opn., *post*, at p. 1412.) The dissent then quotes portions of the modified THP proclaiming that the proposed timber harvest would not significantly affect the water supply. These conclusory statements, unsupported by empirical or explanatory information, are wholly insufficient to allow the public to intelligently assess the impact of the proposed logging on the area's water table.

In any event, the most glaring omission in the THP's analysis of the water supply issue was analyzing the project in a vacuum and failing to consider the impact of the proposed timber harvesting on the local water supply when viewed in combination with other known or foreseeable water-consuming activities nearby. It is well documented that the project area suffers from water scarcity. The grove is on a coastal ridge where community wells are not supported by a large, general aquifer; instead, water is gathered in localized pockets. Numerous members of the public wrote letters to the Department expressing the generalized fear that the proposed timber harvesting, when considered in conjunction with other nearby activities, would only serve to further deplete the local water supply. The modified THP did not acknowledge, let alone discuss, the fact that immediately adjacent to the grove is a heavily irrigated vineyard and a residential subdivision which has already suffered from serious water shortages. Nor did it consider how the local water table would be affected by Van Alstyne's plan to log the grove again in 10 to 15 years.

As was explained in *Laupheimer* v. *State of California* (1988) 200 Cal.App.3d 440, 462 [246 Cal.Rptr. 82], the Department "must consider all significant environmental impacts . . . regardless whether those impacts may be expected to fall *on or off the logging site,* and regardless whether those impacts would be attributable solely to activities described in the timber harvesting plan or to those activities *in combination with other circumstances including but not necessarily limited to other past, present, and reasonably expectable future activities in the relevant area.*" (Italics added.) In other words, as the CEQA guidelines explain, cumulative impacts can result from "the *incremental impact* of the project when added to other closely related past, present, and reasonably foreseeable probable future projects." (Regs., § 15355, subd. (b), italics added.) The THP therefore fails to address a fundamental question—how will various land-use activities in the area surrounding the grove combine with the present plan to cumulatively affect the water supply?

Appellants contend that the general topic of cumulative impacts and the specific topic of water supply and fog drip were adequately addressed in the

Department's official written response to public comments. We first note that under the express terms of the forestry rules, the Department is not required to respond to a point raised by the public unless it first determines that the environmental issue is, in fact, significant. (Regs., § 1037.8.) The fact that the issue of water supply was addressed at length in the Department's written response to public comment comes very close to acknowledging that the public, in fact, had raised a "fair argument" that this proposed timber harvesting might have a significant environmental impact.

In any event, it is undisputed the Department's response was not prepared as part of the THP that was available for public comment but was only issued after the THP had been approved. (See Regs., § 1037.8.) " 'If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees.' " (*Sierra Club, supra,* 7 Cal.4th at p. 1229, citing *Laurel Heights, supra,* 47 Cal.3d at p. 392.) In pursuing an approach that "releas[es] a report for public consumption that hedges on important environmental considerations while deferring a more detailed analysis to [a report] that is insulated from public review" the Department pursued a path condemned as inconsistent with the purpose of CEQA in this division's opinion in *Mountain Lion Coalition* v. *Fish & Game Com.* (1989) 214 Cal.App.3d 1043, 1052 [263 Cal.Rptr. 104]. Certainly, the Department cannot expect the public's access to information after the fact to substitute for the opportunity to influence the Department's decisions before they are made.

In the end, to carry the proposition of the dissent to its logical extreme is to introduce into the law a principle not heretofore recognized by any authority, i.e., that in order to raise a fair argument, members of the public must bring forth impeccably credentialed experts who offer scientifically irrefutable, site specific information foretelling certain environmental harm without information supporting a contrary position. To the contrary, as pointed out by *Stanislaus, supra,* 33 Cal.App.4th at page 152, the evidence supporting a fair argument should not be equated with "overwhelming or overpowering evidence." Nor does it have to be uncontradicted. " 'Substantial evidence' [to support a fair argument] as used in [CEQA] guidelines means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Regs., § 15384, subd. (a).)

Furthermore, the CEQA guidelines provide that "[i]n marginal cases where it is not clear whether there is substantial evidence that a project may

have a significant effect on the environment" the existence of a "serious public controversy over the environmental effects of a project" shall tip the balance toward full environmental review. (Regs., § 15064, subd. (h)(1).) In this case, the proposed timber harvest generated a heightened degree of public controversy, as demonstrated by the more than 250 letters from citizens and public officials raising various environmental concerns. The repeated references in these letters to the issue of water availability at the very least necessitated careful examination of this issue. When considered under this "low threshold" we believe the record contains substantial evidence on which one could base a "fair argument"—requiring the need for further analysis—that the proposed timber harvesting, even as mitigated, would have an individual or cumulative impact on the area's water supply. (*Stanislaus, supra,* 33 Cal.App.4th at pp. 151-152; cf. *Gentry, supra,* 36 Cal.App.4th at pp. 1422-1423 [professor's uncorroborated opinion that the project would affect groundwater in certain area and residents' "unsubstantiated opinions and concerns" did not constitute substantial evidence supporting a fair argument of potential adverse environmental impact].)

At this juncture, it is important to emphasize that the language of Regulations section 1051.1, subdivision (d), significantly narrows the scope of the analysis of cumulative impacts required in a modified THP. That section provides "[w]here issues (a fair argument) are raised the [registered professional forester] *shall complete the appropriate portion* of Technical Rule Addendum No. 2 and submit that information for the Director's review." (Italics added.) In other words, the potential impact or impacts which must be addressed by a formal, technical cumulative impacts analysis in compliance with Rule 2 are limited to those impacts to which a fair argument based on substantial evidence has been raised.

For example, the record in our case reflects that the public raised a wide range of issues with regard to Van Alstyne's proposed timber harvesting. However, the question presented on appeal deals solely with the propriety of the Department's approval of Van Alstyne's THP in the absence of a formal cumulative impacts analysis under Rule 2 after the public had raised a fair argument with respect to the effect of the proposed timber harvesting on the local water supply. Accordingly, in conducting a cumulative impacts assessment as required by Regulations section 1051.1, subdivision (d), Van Alstyne should be expected to submit the required documentation under Rule 2 solely with respect to the issue of water supply.

*Project Alternatives*

We next consider whether the Department prejudicially abused its discretion in failing to require a discussion of project alternatives. In *EPIC,*

we pointed out that "[the Department] and public review of the THP prior to approval is intended to ensure that the adverse environmental effects are substantially lessened, *particularly by the exploration of feasible less damaging alternatives to the proposed harvesting project.*" (*EPIC, supra,* 170 Cal.App.3d at p. 610, italics added.)

We can find no discussion of project alternatives in the modified THP that was subject to public review.[11] When this deficiency was argued as one of the grounds for issuing the writ, the Department argued below that a discussion of alternatives was unnecessary because of the extensive mitigation required as a condition of proceeding under Regulations sections 1051 and 1051.1. As noted earlier, the Department has retreated from that position and has acknowledged in supplemental briefing that a legally sufficient THP must include some consideration of feasible alternatives even if the project's significant environmental impacts will be avoided through mitigation measures. This view is in accord with that of the Supreme Court, which has made it abundantly clear that mitigation measures, even where they are expected to eliminate significant environmental effects, still cannot substitute for a discussion of project alternatives. (*Laurel Heights, supra,* 47 Cal.3d at pp. 400-403; see also *Sierra Club, supra,* 7 Cal.4th at p. 1230.)

On appeal, the Department claims that alternatives were considered because "the issue of feasible alternatives and the consideration of public comment, agency recommendations and mitigation measures are essentially inseparable . . . ." The vice of this "mulligan stew" approach to environmental document drafting is that it jumbles several important concepts, each having a different meaning and each entitled to separate consideration.

The dissent adopts the Department's approach and essentially argues that alternatives were considered because the timber harvester completed a form on which he checked a box selecting a certain cutting method from 13 descriptions and checked another box describing the yarding system to be used in carrying out the harvesting from 6 descriptions. The dissent reasons as follows—if the timber harvester selects a clear-cut over other silvicultural methods, he must have considered the other described methods; or, if the

---

[11]Some proposed project alternatives, brought to the Department's attention through the public review process, are discussed in the Department's official response to public comment issued *after* the THP had been approved. As we have held, this after-the-fact analysis cannot fulfill the requirement that the document circulated for public review contain the necessary information regarding project alternatives. To paraphrase the court in *Laurel Heights,* under the Department's view, "a project proponent would never have to discuss alternatives. It would merely respond to alternatives proposed by others. There is not even a hint in CEQA that the Legislature intended such a result." (*Laurel Heights, supra,* 47 Cal.3d at p. 405.)

timber harvester selects cable yarding over other yarding methods, he must have considered those other methods. The flaw in this reasoning is that the methods used or rejected in carrying out the project are not alternatives to the project. When a timber harvester elects to use one cutting method over another or one yarding method over another to avoid an adverse impact, this is a step taken in mitigation. It is not an alternative to the proposed activity. An alternative to a proposed activity is just that—a description of *another* activity or project that responds to the major environmental issues identified during the planning process. (§ 21080.5, subd. (d)(3)(i).)

The only true alternatives were brought forth by the public and discussed only after the THP had been approved. For instance, an alternative plan was proposed that would have preserved the larger and old-growth trees on the site but would have allowed logging to go forward. Other members of the public, including the Sierra Club, asked the Department to consider an alternative that would have allowed for interested persons, including the county open space district, to purchase the stand. These alternatives, as well as others, should have at least been considered before the plan was approved.

*Disposition*

The judgment of the superior court to issue a peremptory writ of mandate compelling the Department to rescind its approval of timber harvesting plan 1-94-131 SON is affirmed.

Haning, J., concurred.

**PETERSON, P. J.,** Concurring and Dissenting.—I concur with the majority on several important issues. I agree that a court reviewing a decision by the California Department of Forestry and Fire Protection (the Department) to approve a timber harvest plan (THP) must do so by administrative mandamus (Code Civ. Proc., § 1094.5), and that the trial court here erred both because it treated the matter as one under traditional mandamus (Code Civ. Proc., § 1085), and because it considered evidence outside the administrative record. I also agree that a timber harvester who has submitted a modified THP pursuant to California Code of Regulations, title 14,[1] section 1051 must complete the appropriate portion of Technical Rule Addendum No. 2 (Regs., § 912.9) (Rule 2) whenever there is substantial evidence in the record to support a fair argument that significant individual or cumulative impacts will

---

[1] All subsequent references to the California Code of Regulations, title 14 will be to Regulations.

result from the proposed timber operations. However, I respectfully dissent from the majority's application of that test. There was absolutely no credible evidence in the administrative record to support the conclusion that this timber harvest would cause any significant individual or cumulative impact. Thus, no analysis of those impacts was necessary. The modified THP here did address project alternatives adequately and cannot be deemed defective on that ground. I further dissent from the majority's contrary conclusion.

I begin my analysis by recognizing an important but frequently over-looked point: Timber harvesting is not just tolerated in California; *it is encouraged*. (See Pub. Resources Code,[2] § 4512, subd. (c) ["[I]t is the policy of this state to encourage prudent and responsible forest resource management *calculated to serve the public's need for timber and other forest products . . . .*"].) This policy extends, in particular, to small nonindustrial timber owners, like appellant Bruce L. Van Alstyne (Van Alstyne), who want to conduct a limited harvest. (§ 4593, subd. (a).) Furthermore, the Legislature has specifically recognized that limited harvests cause "minimal environmental harm . . . because low volume production and dispersion around the state of these small tracts reduces damage to aesthetics, air quality, watersheds, and wildlife." (*Id.*, subd. (b).)

The Department sought to implement this policy of encouraging small nonindustrial harvests by adopting the modified THP procedures set forth in Regulations section 1051 et seq. The heart of those procedures is found in Regulations section 1051 which sets forth a long list of stringent environmental restrictions and mitigations that must be adopted in order to qualify a modified THP.[3] Operations that comply with all of those requirements "are presumed to be unlikely to cause a significant adverse impact to the environment . . . ." (Regs., § 1051.1, 6th par.) However, this presumption can be rebutted if "the Director [i.e., the Department] determines in consultation with trustee or responsible agencies, or upon review of public comments that

---

[2] Unless otherwise indicated, all subsequent statutory references are to the Public Resources Code.

[3] Regulations section 1051 provides: "(a) On an ownership of 100 acres or less of timber-land, a modified [*THP*] may be filed by a plan submitter, providing that the following conditions and mitigations are met:

"(1) No more than 70% of any existing tree canopy layer is to be harvested on parcels 40 acres or less, and not more than 50% on parcels 41-100 acres. The canopy retained shall be well distributed over the harvest area. Not more than 10% of the THP area shall be harvested under the rehabilitation method. A sample area must be marked before submission of the THP. The sample area shall include at least 10% of the area which is representative of the range of conditions present in the area.

"(2) Clearcutting and shelterwood removal, as defined in [*Regulations section*] 913.1(b) and (d) [933.1(b) and (d), and 953.1(b) and (d)] shall not be used, except for legally deeded

a fair argument exists that significant individual or cumulative impacts will result from timber operations. Where issues (a fair argument) are raised the RPF shall complete the appropriate portion of [Rule 2] and submit that information for the Director's review." (*Id.* at 7th para.)

With this background, I turn to the specific issues raised. The majority holds, and I agree, that a timber harvester must complete the appropriate portion of Rule 2 (i.e., an abbreviated cumulative impact analysis) whenever there is substantial evidence in the administrative record to support a "fair argument" that significant individual or cumulative impacts will result from the proposed timber operations. The majority holds that the Department was required to make a Rule 2 analysis of the THP's cumulative impact, because

*rights-of-way* or easements for utility purposes which are documented in the plan by the RPF [*registered professional forester*] by reference to specific deeds or surveys.

"(3) Stocking standards, specific to the silvicultural method selected, must be met immediately after harvesting operations are completed.

"(4) No heavy equipment operations on slopes greater than 50%, or on areas with high or extreme erosion hazard ratings.

"(5) No construction of new skid trails on slopes over 40%.

"(6) No timber operations in Special Treatment Areas except log hauling on existing roads not requiring reconstruction.

"(7) No timber operations on slides or unstable areas.

"(8) New road construction is confined to 600 feet and a 1,000-foot limit total of road construction and reconstruction combined.

"(9) No heavy equipment operations within a watercourse or lake protection zone [*WLPZ*], meadows, or wet areas, except for maintenance of existing roads, drainage facilities or structures.

"(10) No listed species will be directly or indirectly adversely impacted by proposed timber operations. For timber operations which potentially could adversely affect a listed species or the habitat of the species, the consultation process with [*the Department*] pursuant to Fish and Game Code [*sections*] 2090 or 2091 shall be completed before the THP is approved.

"(11) Timber harvesting is only allowed in the WLPZ if: 1) sanitation-salvage harvesting is the only silvicultural system to be used in the WLPZ and it must be in compliance with [Regulations sections] 916.4[*(b)*] [936.4[*(b)*]], 956.4[*(b)*]] . . . ; or 2) if harvesting removes no more than 30% of any existing canopy layer. Harvesting under 2) above shall not occur again in the WLPZ for a 10-year period following completion of the THP.

"(12) No timber operations within potentially significant archeological sites.

"(13) No alternatives, exceptions, or in-lieu practices allowed for watercourse or lake protection measures, standard road and landing widths, or erosion control measures, except for use of existing roads within WLPZ after RPF compliance with examination, evaluation, and mitigation(s) per [*Regulations sections*] 916.4(a) [936.4(a), 956.4(a)].

"(14) Winter timber operations except as conditioned by the Director to avoid potential significant cumulative impacts shall be in accordance with [*Regulations sections*] 914.7(a) and (b) [934.7(a) and (b), 954.7(a) and (b)].

"(15) Harvesting will not reduce the amount of the timberland occupied by late succession forest stands currently greater than or equal to 5 acres in size.

"(16) In addition to (1)-(15) *all other rules of the Board shall apply to operations specified in this section.*" (Italicized brackets are added; underscored material is corrected errors in spelling and punctuation.)

allegedly substantial evidence in the record supported the conclusion that the proposed timber harvest could reduce the amount of fog drip produced by trees to be harvested and thereby adversely affect the water supply of the area. This latter conclusion is wholly belied by the record before us.

In this context, substantial evidence is defined to mean "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made is to be determined by examining the entire record. Mere uncorroborated opinion or rumor does not constitute substantial evidence." (Regs., § 15384, subd. (a).)

Here, although the majority ignores the fact, the Department conducted an exhaustive multidisciplinary preharvest inspection and prepared a report to summarize its findings. That report specifically concluded the proposed harvest *would not* reduce water supplies in the area. "The amount of trees being removed will not have any noticeable effect [on] either the water table or the surface water in the area." This conclusion was supported by a senior engineering geologist who participated in the preharvest inspection and who submitted a report stating, "Some concern was expressed by neighboring landowners regarding the potential for the proposed timber harvesting to adversely affect wells and ground water quantity. Removing timber is a common practice used to enhance summer base flows of wells and springs. Soil water that would have been used by the trees infiltrates to the ground water table where a substantial percentage of the vegetation has been removed. However because the proposed harvest is very light, it is unlikely that there will be a significant affect on ground water supplies." This conclusion was further supported by the Department's official response to public comments made during the review process. The Department explained that the impact of selective harvesting upon available water supply had been the subject of several scientific studies and that based on those studies, "little net change in water availability is expected to occur. . . . [T]he THP proposes to remove between 20 and 30% of the total canopy within the 35 acre stand. At most, fog drip may be reduced by a proportion roughly equivalent to the decrease in conifer canopy. This temporary canopy reduction will coincide with a reduction in evapotranspirational water loss. The vast majority of forest research documents increases in available ground water following the removal of timber . . . . These increases are expected to be both minor and short-lived, due to regrowth of the forest canopy. Significant impacts upon water availability are not expected to occur." Thus, the record here includes ample evidence to support the conclusion that the proposed selective harvest would *not* adversely affect the water supply.

What evidence is there to support a different conclusion? The majority first relies on a paper prepared in 1987 by a student at Humboldt State University, Steven A. Harris, entitled *Relationship of Convection Fog to Characteristics of the Vegetation of Redwood National Park.* The paper itself does not present any independent research, but is a compilation of other articles that discuss fog drip in areas as far away as Australia and Japan. The paper is not specific to the site at issue; and while it discusses the phenomena of fog drip generally, it says absolutely nothing about the precise issue at hand: whether the proposed selective harvest might reduce the local water supply. The Harris paper is far too general and nonspecific to support any reliable conclusions. "[S]peculative possibilities are not substantial evidence of environmental impact." (*Citizen Action to Serve All Students* v. *Thornley* (1990) 222 Cal.App.3d 748, 756 [272 Cal.Rptr. 83].)

Next, the majority relies on comments made by Daniel E. Wickham at a review team hearing that the proposed harvest might affect the water supply. Multiple problems exist with the conclusions of Wickham. First, he told the members of the review team that he had a Ph.D. in ecology. In fact, he later submitted a declaration (under penalty of perjury) stating that his Ph.D. was in zoology, not ecology, and that he specialized in marine ecosystems. As a general rule, testimony by a witness who is not competent to render an opinion is not deemed substantial evidence. (See, e.g., *Cathay Mortuary, Inc.* v. *San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 281 [254 Cal.Rptr. 778] (*Cathay Mortuary*).) I fail to understand, and the record does not disclose, how a zoologist who specializes in marine life is qualified to provide an opinion about the effect of fog drip on the water supply of real property. Wickham simply based his conclusions (such as they were) *entirely* on the Harris paper. Since the basis for Wickham's opinion was obviously flawed, his opinion was as well. An agency may, and the Department obviously did, disregard Wickham's purported "expert" testimony because, inter alia, it lacked adequate foundation. (See *Lucas Valley Homeowners Assn.* v. *County of Marin* (1991) 233 Cal.App.3d 130, 156-157 [284 Cal.Rptr. 427] (*Lucas Valley*).)[4]

The majority strives mightily to bolster Wickham's credentials by noting he worked as a staff ecologist at a marine laboratory for a number of years,

---

[4]The majority's uncritical acceptance of Wickham's obviously unsubstantiated conclusions illustrates one of the major problems an administrative agency must face when deciding whether to prepare an environmental impact report (EIR) or some equivalent document. An agency in that situation will commonly receive information from various persons, some of whom claim to possess expert qualifications. However, since the information is usually received in an informal setting and is not subject to cross-examination, it is often difficult to determine if the "expert" possesses the qualifications he claims; or if he possesses some qualifications, whether they are relevant to the issue under consideration. Where, as here, the record clearly shows a person is making predictions that he is not qualified to make, I believe a court should ignore those predictions and defer to the administrative agency's findings. (Cf.

and he worked on wastewater treatment issues in Sonoma County. While these experiences may have qualified Wickham to express an opinion on sewage disposal or pollution in marine ecosystems, I see nothing that suggests he had any experience in forestry or that he was qualified to express an opinion on fog drip. Contrary to the majority's statement, I do not believe that to raise a fair argument, "members of the public must bring forth impeccably credentialed experts who offer scientifically irrefutable, site-specific information foretelling certain environmental harm . . . ." (Maj. opn., *ante*, at p. 1402.) I do, however, believe that persons who purport to make predictions about possible adverse environmental effects must be qualified to express those opinions. Common sense and case law require no less. (See *Cathay Mortuary, supra,* 207 Cal.App.3d at p. 281.) Indeed, by ruling the Department was required to credit Wickham's unsubstantiated conclusions, the majority simply ignores a long line of authority holding an agency may reject the conclusions of an expert that are outside his area of expertise, that lack an adequate foundation, or that do not relate directly to the specific issue under review. (See *Lucas Valley, supra,* 233 Cal.App.3d at pp. 156-157 [A real estate agent was not qualified to render an opinion on a project's effect on property values.]; *Gentry, supra,* 36 Cal.App.4th at pp. 1421-1422 [A letter from an engineering professor about groundwater and erosion impacts was not substantial evidence because it was based on an inadequate factual foundation.]; *Association for Protection etc. Values* v. *City of Ukiah* (1991) 2 Cal.App.4th 720, 734-735 [3 Cal.Rptr.2d 488] [A letter from a geologist regarding possible soil instability was not substantial evidence of potential adverse impact because it did not conflict with specific evidence showing the project had been engineered correctly.].)

In sum, it is important to note that junk science does not emanate, solely, from the attempted testimony of purported experts on subjects within a fact finder's ken. (Evid. Code, § 801, subd. (a).) It is not infrequently offered in trial courts and administrative hearings, as it was here, by purported experts who lack the requisite expertise in the matters on which they opine.[5] The courts should discourage both practices.

---

*Gentry* v. *City of Murrieta* (1995) 36 Cal.App.4th 1359, 1400 [43 Cal.Rptr.2d 170] (*Gentry*) [Even under the "fair argument" test, a lead agency "has some discretion to determine whether particular evidence is 'substantial.' "].)

[5] " 'A witness cut loose from time-tested rules of evidence to engage in purely personal, idiosyncratic speculation offends legal tradition quite as much as the tradition of science. Unleashing such an expert in court is not just unfair, it is inimical to the pursuit of truth. The expert whose testimony is not firmly anchored in some broader body of objective learning is just another lawyer, masquerading as a pundit.' [Citation.]" (*People* v. *Johnson* (1993) 19 Cal.App.4th 778, 789 [23 Cal.Rptr.2d 703].)

On appeal, we review acceptance or rejection of expert testimony by courts and administrative agencies by the same standard—abuse of discretion. In such review of the administrative record here, we must decide if substantial evidence exists to anchor Wickham's testimony in a body of objective learning qualifying him to opine on the effects of fog drip on Van Alstyne's property. None does.

When that conclusion is reached, we owe the same deference to fact-finding administrative agencies we extend to trial courts, i.e., we must affirm the administrative body's decision clearly disregarding that unqualified opinion. We must do so even though such opinion was presented to the agency in an administrative hearing open to the public, where the fact-determining agency lacks a safeguard judicial proceedings provide: a judge acting as gatekeeper to exclude such opinion evidence from a jury's consideration.

Next, the majority relies on language from a study the Department itself submitted to support its conclusion that the selective harvest proposed here would not adversely affect the water supply. The study in question (Keppeler & Ziemer, *Logging Effects on Streamflow: Water Yield and Summer Low Flows at Caspar Creek in Northwestern California* (July 1990) 25 Water Resources Research 1669, 1678) concludes that selective logging results in an *increase* in the available water supply, but that the increase is only temporary. The majority seizes on an isolated passage in the Keppeler study which notes that during one particular timber harvest, "An important contradiction in the pattern of increased flows after logging was observed . . . ."; in that one instance, a "small decrease in annual water yield was noted." (P. 1670.) However, the majority fails to acknowledge that the timber harvest which resulted in a "small decrease in annual water yield" was a clear cut. (*Ibid.*) The fact that a clear cut can result in a "small decrease in annual water yield" does not support the conclusion that a "very light" selective harvest such as that proposed here might adversely affect the water supply.

Finally, the majority relies on letters submitted by Dan E. Steimle, a property owner, and Ernest L. Carpenter, a member of the Sonoma County Board of Supervisors, both of whom expressed concern about the water supply. However, Steimle based his comments solely on a report (prepared in 1982) that allegedly showed some correlation between the land containing the grove to be selectively and partially harvested and producing water wells in the area. That report says nothing about fog drip, nothing about selective harvests, and nothing about whether the removal of a limited number of trees might adversely affect the water supply. Speculation and unfounded conclusions are not substantial evidence. (*Leonoff* v. *Monterey County Bd. of*

*Supervisors* (1990) 222 Cal.App.3d 1337, 1352 [272 Cal.Rptr. 372].) Carpenter's letter is even less substantial. He simply states that various constituents have expressed their concern about the water supply. Nothing in that letter supports the conclusion that adverse effects will actually occur.

In sum, the administrative record in this case includes site specific, scientifically based evidence that shows this modified THP would not adversely affect the water supply, and absolutely no substantial evidence it would. Under these circumstances, I would hold that no "fair argument" was made supporting a Rule 2 analysis of the individual or cumulative impacts allegedly produced by this modified THP; and the Department properly found such analysis was not required.

I also disagree with the majority's conclusion that the modified THP here was inadequate because it did not address project alternatives.[6] In fact, the modified THP form used here required Van Alstyne to consider and select among various alternatives and to explain his choices. For example, section 15 of the form application for the modified THP requires the harvester to choose the harvesting method to be used from a list that includes various options such as shelterwood, seed tree, commercial thinning, and salvage. Van Alstyne chose the "Selection" alternative and further specified "Individual tree selection [pursuant to Regulations section] 913.2(a)" which is a reference to a regulation under which trees are removed individually or in small groups. Section 19 of the form requires the harvester to select the type of yarding systems to be used from various options including balloon, helicopter, animal, or cable. Van Alstyne selected "Tractor, skidder, forwarder." Having selected that alternative, sections 22 through 25 of the form required Van Alstyne to consider the environmental consequences of his choice and to explain and justify any adverse affects. Sections 30 through 37 of the form required Van Alstyne to consider the types of roads and landings that would be needed to conduct the harvest and whether they would cause any adverse affects. If Van Alstyne had answered affirmatively to any of these questions regarding adverse affects attendant to his choice selections, he would have been required to explain and justify his choice and to "give site-specific measures to reduce adverse impacts . . . ."

While the discussion of alternatives here was not as detailed as might be found in a conventional EIR, it was more than adequate to address the actual environmental issues involved in this modified THP permit. Most importantly, it was entirely consistent with the modified THP procedure, the entire

---

[6]I will assume, arguendo for purposes of my analysis, that a modified THP is required to discuss project alternatives. A strong argument can be made, however, that no such discussion of those alternatives is required. (See Regs., § 15252, subd. (b)(2).)

goal of which is to reduce the "regulatory burden" on the plan submitter. (Regs., § 1051.3.)

The majority suggests the analysis of alternatives was inadequate because it was not segregated into a separate section of the modified THP with an appropriate heading. The majority has not cited any authority stating this is required, and I am aware of none. In fact, a leading commentator states, "There are several methods for setting forth [the analysis of alternatives] in an EIR, and the courts have not favored any particular method. Most often, the alternatives analysis is set forth in a separate section that contains a brief, category-by-category analysis of the various impacts of each alternative. . . . *An alternatives analysis may also be set forth in each topical section of the EIR rather than in a separate section; thus, the geological analysis of alternatives would be set forth in the geology section of the EIR, and so forth.*" (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1996) § 15.24, p. 606, italics added.) The second method described above was used here.

The majority also says the analysis of alternatives was inadequate because it focused primarily on identifying less intrusive methods of harvesting instead of providing a description of other activities or projects. However, THP's, like EIR's, are subject to a " 'rule of reason' " that requires only a discussion of alternatives necessary to permit a reasoned choice. "The alternatives shall be limited to ones that would avoid or substantially lessen any of the significant effects of the project." (Regs., § 15126, subd. (d)(5).) The discussion of alternatives here satisfied this requirement fully.

Finally, the majority says the THP should have discussed alternative harvesting plans such as one that "would have preserved the larger and old-growth trees on the site but would have allowed logging to go forward," or an alternative that would have allowed "interested persons . . . to purchase the stand." (Maj. opn., *ante,* at p. 1405.) The first of these alternatives was discussed and, in fact, was an essential component of the proposed THP. Under the proposed plan, "The largest trees and those showing wildlife habitat characteristics" were to be left as specimens. The majority's second alternative violates the " 'rule of reason' " discussed above. It is unreasonable and without statutory or regulatory support to require one who wishes to conduct a limited timber harvest on his own property to engage in the fiction of discussing the possible sale of that property as an "alternative plan" in order to receive a THP when the owner has posited no intention of doing so. Nothing contained in the Public Resources Code and the Department's regulations indicates an application for a modified THP—an admittedly

truncated procedure to aid the small landowner—is intended to trigger a sale of the applicant's property as an alternative to receipt of the permit for which application is made.

I conclude the trial court here erred when it issued a preemptory writ of mandate compelling the Department to rescind its approval of the modified THP at issue. I would reverse.

A petition for a rehearing was denied March 27, 1997, and the petition of real parties in interest for review by the Supreme Court was denied May 21, 1997. Baxter, J., and Brown, J., were of the opinion that the petition should be granted.